**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lee R. JOHNSON, Defendant–Appellant.**

**No. 86–6192.**

United States Court of Appeals,
Sixth Circuit.

Argued July 30, 1987.

Decided Aug. 23, 1988.

Before ENGEL, Chief Judge,* and MERRITT and KRUPANSKY, Circuit Judges.

KRUPANSKY, Circuit Judge.

Defendant-appellant, Dr. Lee R. Johnson (Johnson), appealed following a bench trial in which he was convicted upon one count of transmitting obscene materials through the mails in violation of 18 U.S.C. § 2252, and fifteen counts of receiving obscene materials through the mails in violation of 18 U.S.C. § 1461.

Johnson, an associate professor of history at Memphis State University, is a self-confessed pedophile. Beginning in the mid–1970's and continuing until October of 1985, Johnson acquired and maintained a sizeable collection of pedophilic materials which included: 100 magazines, 58 books and booklets, 13 reels of film, and numerous drawings. The collection also included advertising brochures that contained sexually explicit photographs of children. Several of the items in the collection remained in the original postmarked envelopes in which they had been received by Johnson from commercial distributors in California, Denmark, Sweden and the Netherlands.

In a letter dated July 29, 1983, Johnson came to the attention of postal inspectors by responding to an advertisement contained in *Screw Magazine,* placed by Postal Inspector Daniel Mihalko (Mihalko) as part of an undercover investigation involving mail obscenity. The advertisement offered the sale of materials depicting "Youthful Interests," "Fun Farm," and "Latin Family Fun." Johnson's letter stated:

"I am interested in family fun and *young* girls. I will buy 8mm films, magazines and photo sets, (Hard core only). I am over the age of 21, and I am not affiliated with or acting for any censorship or law enforcement agency. All material is intended for my personal use."

Upon receipt of the letter, Mihalko mailed a preprinted order form to Johnson, which he subsequently completed and returned to Mihalko on September 12, 1983.

Kemper B. Durand, argued, Memphis, Tenn. (court-appointed), for defendant-appellant.

W. Hickman Ewing, Jr., U.S. Atty., Memphis, Tenn., Dan Newsom, argued, for plaintiff-appellee.

* The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

The investigation of Johnson was thereafter assigned to Postal Inspector Dennis Wichterman (Wichterman).[1] In a letter to Johnson postmarked December 14, 1984, Wichterman adopted the fictitious identity of "Jake Wichoff" who represented a company named "Young Tallent [sic] Enterprises." Wichterman described the fictitious company as a group of entrepreneurs specializing in "the discovery and circulation of new young talent" and invited Johnson to permit the company to mail additional information. Johnson responded in a letter postmarked December 18, 1984, stating that Wichterman's fictitious organization "sounds like just what I have been looking for ... and if your material is of good quality, I expect to be one of your best customers...." Thereafter, Wichterman requested Johnson to specify his needs. Johnson replied by advising Wichterman that he was interested "in purchasing drawings, photographs or films of young girls engaging in various activities with young men, or with their families." Johnson also solicited from Wichterman the names of anyone in the Memphis area who could supply him with the desired pedophilic material and requested Wichterman to circulate his name to anyone capable of fulfilling his needs.

In further correspondence, Wichterman cautioned Johnson that "[p]ostal officials and law enforcement are everywhere...." Undeterred by Wichterman's warning, Johnson responded by suggesting that he would be willing to exchange items from his collection of child pornography, with Wichterman or others, in return for similar materials. In addition, Johnson stated that he would "be interested in making personal contacts with families who share my interest."

At this point, Wichterman changed his identity with Johnson and assumed the fictitious identity of "Daniel" who was held out to be a collector of pedophilic materials and was referred to Johnson by the fictitious "Jake Wicoff." Johnson responded favorably by letter. In further correspon-

dence, Johnson listed specific magazines and films contained in his collection which he desired to exchange for similar material. Johnson suggested that the two meet in Chattanooga, Tennessee to swap materials because "I don't want to put anything in the mail," and requested Wichterman to refer him to someone who would sell him pedophilic materials.

In his next letter, Wichterman listed the titles of several magazines in which he believed Johnson would have interest. In refusing Johnson's suggestion to meet in Chattanooga, Wichterman stated "I don't know about you but I can't afford to travel to meet everybody I'm going to trade with." In addition, Wichterman suggested that it would be safer for Johnson to rent a post office box instead of using his home address.

Within fourteen days, Johnson wrote to advise Wichterman that he had rented a post office box and that he possessed certain magazines that Wichterman sought. Agreeing with Wichterman's claim that he could not financially afford to travel every time that he wished to exchange materials, Johnson stated he would travel to Chattanooga because he was "antsy about putting things in the mail."

Rather than immediately answering Johnson's letter, Wichterman delayed his next communication for several weeks. In further correspondence with Johnson, Wichterman stated that he had been vacationing in Florida and had reviewed the proposed exchange of pedophilic materials. Wichterman also related a fictitious expectation of a sexual liason with a young girl named "Julie" with whom he had recently become acquainted. In a reply dated June 23, 1985, Johnson stated "I was glad to hear that you were only in Florida [because] I was beginning to think that something was wrong." In response to Wichterman's ficticious pursuits with "Julie," Johnson wrote

---

1. In his communication with Johnson, Wichterman always used a fictitious identity which was changed over the course of the investigation. Thus, for clarity, he will hereinafter be referred to as "Wichterman."

"I'd like to make personal contact, but with the heat on the way it is I don't dare to try here, and don't know how to go about making contact elsewhere. (We have no children ourselves)."

Further, Johnson cautioned Wichterman that the child might "blow the whistle[.]" Lastly, Johnson reiterated his desire to expand the size of his collection by either purchasing or trading pedophilic materials, and again requested Wichterman to refer him to someone who would be willing to sell him child pornography.

In his following letter dated July 7, 1985, Wichterman described a video tape of a couple and their eight year old child that he hoped to obtain from a collector in Michigan. Wichterman also stated "[A]s far as magazines, yes, I would love to borrow some to photograph and enjoy." Wichterman also indicated that he was in the process of creating a video tape of certain magazines he possessed containing sexually explicit photography of children and inquired whether Johnson would be interested in contributing any material. At no time did Wichterman direct Johnson to use the mails to transmit the magazines requested.

Shortly thereafter, on July 18, 1985, Wichterman received a plain brown paper package that contained three magazines of sexually explicit photographs of children. The package listed Johnson's post office box as a return address.

Wichterman posted a letter to Johnson wherein he acknowledged receipt of the package, and suggested that he would personally visit Johnson in Memphis during September of 1985. In response to Wichterman's statement that he had received the package, Johnson wrote

"I'm glad you got the materials I sent you. I didn't enclose a note because I didn't know if that would be prudent—remember, I'm still new at this."

Johnson also agreed to Wichterman's suggestion that they personally meet at Johnson's apartment. Further correspondence ensued in which Wichterman and Johnson mutually planned to meet in October of 1985.

Wichterman obtained a valid warrant authorizing a search of Johnson's apartment and, accompanied by other postal inspectors, proceeded to his address on October 2, 1985. Upon meeting with Johnson and entering the apartment, Wichterman identified himself as a postal inspector and served Johnson with the warrant. The other postal inspectors then entered the apartment and a search was conducted that disclosed a substantial collection of child pornography. Johnson thereupon voluntarily admitted that he had mailed a package containing sexually explicit photographs of children to Wichterman, and had consented to a search of his office at Memphis State University which revealed additional pedophilic materials.

On October 3, 1985, a criminal complaint charged Johnson with one count of transmitting child pornography through the mails in violation of 18 U.S.C. § 2252. Johnson was subsequently indicted on October 16, 1985, and entered a plea of "not guilty" on October 23, 1985. A superseding indictment was returned on January 7, 1986, which additionally charged Johnson with seventeen counts of receiving pornography through the mails in violation of 18 U.S.C. § 1461 and 18 U.S.C. § 2.[2] Johnson was subsequently arraigned on January 2, 1986, and pled "not guilty" to all counts.

In an opinion filed on August 11, 1986, the district court determined that Johnson was guilty on all counts. Johnson was subsequently sentenced to a five year period of probation. He thereafter filed a timely notice of appeal to this court.

On appeal, Johnson raised four arguments. In regards to his conviction under 18 U.S.C. § 2252, Johnson contended that the government failed to prove beyond a reasonable doubt that he was predisposed to sending obscene material through the mails. Secondly, Johnson argued that the investigatory tactics of the postal inspectors were so outrageous as to constitute a

---

**2.** Two of the seventeen additional counts of receiving pornography in violation of 18 U.S.C. § 1461 and 18 U.S.C. § 2 were dismissed prior to the commencement of Johnson's trial.

deprivation of due process of law. As to his convictions under 18 U.S.C. § 1461, Johnson urged that the district court incorrectly concluded that this statute prohibited a person from causing obscene materials to be delivered to him through the mails. And lastly, Johnson alternatively argued that he lacked the requisite scienter to violate 18 U.S.C. § 1461.

Upon appellate review of the sufficiency of the evidence supporting a criminal conviction, this court must reverse, only if, based on the evidence, "a reasonable mind could not find guilt beyond a reasonable doubt." *United States v. Stull*, 743 F.2d 439, 442 (6th Cir.1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985). *See also Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The evidence must be viewed in the light most favorable to the government. *United States v. Robinson*, 763 F.2d 778, 784 (6th Cir.1985); *Jackson*, 443 U.S. at 318–19, 99 S.Ct. at 2788–89.

Johnson first argued that the conduct of the Government constituted entrapment. Specifically, Johnson urged that the Government failed to establish that he was predisposed to violate 18 U.S.C. § 2252[3] beyond a reasonable doubt.

The defense of entrapment "focus[es] on the intent or predisposition of the defendant to commit the crime." *Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976) (quoting *United States v. Russell*, 411 U.S. 423, 429, 95 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973)). "It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play." *Russell*, 411 U.S. at 436, 93 S.Ct. at 1645, 36 L.Ed.2d at 376.

■ If the lack of predisposition is apparent from the uncontradicted evidence, entrapment can be determined as a matter of law. *United States v. Silva*, 846 F.2d 352, 354–55 (6th Cir.1988). *United States v. Thoma*, 726 F.2d 1191 (7th Cir.1984), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). However, once the issue of predisposition is in dispute, the Government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. *United States v. McLernon*, 746 F.2d 1098 (6th Cir.1984).

■ Predisposition has been defined as "the defendant's state of mind before his initial exposure to government agents." *McLernon*, 746 F.2d at 1112 (quoting *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir.1983)). Factors relevant in determining the defendant's state of mind include:

> the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*McLernon*, 746 F.2d at 1112, (quoting *Kaminski*, 703 F.2d at 1008). The immediate record was replete with evidence from which the district court could have reasonably concluded that the above factors had been proven beyond a reasonable doubt.

The evidence demonstrated that Johnson actively pursued his interest in expanding his collection of pedophilic materials, and that he used the mail in furtherance of this purpose. For approximately ten years, Johnson had used the mail to place his

---

3. Section 2252 of Title 18 stated in pertinent part that:
   (a) Any person who—
   (1) knowingly ... mails any visual depiction, if—
   (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(B) such visual depiction is of such conduct;
...
....

shall be [guilty of a criminal offense].
18 U.S.C. § 2252.

304

orders and receive child pornography.[4] In fact, on one occasion, Johnson learned that the United States Customs Bureau had confiscated one of his overseas orders. However, this did not deter him from continuing to use the mails to expand his collection of child pornography.

Additional insight into Johnson's character can be gleaned from his letters with Wichterman. Johnson expressed great interest in Wichterman's fictitious relationship with a young girl named "Julie." In fact, Johnson indicated that he would be interested in developing sexual contact with a minor similarly inclined. Johnson also cautioned Wichterman to be careful because the young girl could "blow the whistle" on Wichterman. Clearly, Johnson's character and reputation revealed a complete disregard to abide by the law in pursuit of his passion for child pornography.

Furthermore, Johnson was not seduced to criminal activity by repeated government inducements. Johnson came to the attention of postal inspectors by voluntarily responding to an advertisement placed in *Screw Magazine*. Johnson also was the first to express a desire to exchange pedophilic materials. In fact, Johnson disregarded the advice given by postal inspector Wichterman that law enforcement agents were everywhere who could discover their correspondence and any exchange of pedophilic materials. While Johnson presented some reluctance to place obscene material in the mail, the mere suggestion of a possible video cassette composed of pictures from various magazines was sufficient to prompt Johnson to voluntarily seek participation. This is unlike the type of repeated government inducement found in *McLernon*, 746 F.2d at 1113–14.

In *McLernon*, the government agent proposed a profitable business arrangement for marketing and distributing illegal drugs as an inducement for defendant's assistance in organizing the proposed traf-

fic in illegal drugs which defendant repeatedly refused prior to his consenting to participate in the conspiracy. The government agent also exploited the Indian heritage of the "blood brothers" relationship that had developed between the two prior to the proposed drug transaction and professed a death threat against him to further stimulate the defendant to participate in the conspiracy. *See also Silva*, at 354–58. The evidence, in the present case, reflected that far from being coerced by government agents, Johnson was driven by his own unyielding desire to expand his pedophilic collection. Although Johnson did not have a financial stake in the criminal activity, he was profiting from the expansion of his library of child pornography. It is clear that Johnson's predisposition to enlarge his collection at any cost developed long before his correspondence with postal inspectors.

Accordingly, it is apparent from the record taken in its entirety that the district court could have rationally concluded beyond a reasonable doubt that Johnson was predisposed to violating 18 U.S.C. § 2252. As a result, Johnson's defense of entrapment was misplaced.

■ Johnson's charge that his conviction of violating 18 U.S.C. § 2252 was offensive to the Due Process Clause of the Fifth Amendment was equally without merit. Johnson urged that he was denied due process of law because the government employed fundamentally unfair investigative tactics which amounted to outrageous government conduct.

The Supreme Court in *United States v. Russell*, 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973) indicated that some conduct of law enforcement agents might be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* The Sixth Circuit has defined four factors to be taken into

---

**4.** Johnson's contention that pedophilic materials received by him did not demonstrate a predisposition to commit the crime of sending pedophilic materials was without merit. In *United States v. Gantzer*, 810 F.2d 349, 352 (5th Cir. 1987), the court held that defendant's "propensity to receive pornographic—though not necessarily legally obscene—materials through the mail is probative of his predisposition to send legally obscene photographs."

consideration when determining if police conduct impinged constitutional due process protections. These factors are: (1) the need for the type of government conduct in relationship to the criminal activity; (2) the preexistence of a criminal enterprise; (3) the level of the direction or control of the criminal enterprise by the government; (4) the impact of the government activity to create the commission of the criminal activity. *United States v. Robinson,* 763 F.2d 778, 785 (6th Cir.1985); *United States v. Norton,* 700 F.2d 1072, 1075 (6th Cir.1983), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983); *United States v. Brown,* 635 F.2d 1207, 1213 (6th Cir.1980).

On the facts presented by this record, there was clearly no violation of due process. Because the transmission of child pornography through the mails occurs within a shroud of secrecy, it is apparent that the use of an advertisement in *Screw Magazine* and personal correspondence by a postal inspector posing as a pedophilic collector was justified to detect and investigate violations of 18 U.S.C. § 2252. The record contained substantial evidence that Johnson was engaged in a preexisting enterprise to collect child pornography through the mail. Moreover, there is no evidence that Wichterman exercised any control over the criminal activity with which Johnson was charged, or that Wichterman's tactics disproportionately increased the incidence of transmitting obscene materials through the mail. It was Johnson who first solicited Wichterman to exchange pedophilic material. Accordingly, the postal inspector's conduct was not so fundamentally unfair and outrageous as to violate Johnson's due process rights. *See United States v. Thoma,* 726 F.2d 1191 (7th Cir.1984) *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Kabala,* 680 F.Supp. 1254 (N.D.Ill., 1988).

■ Turning to his convictions under 18 U.S.C. § 1461, Johnson argued that this statute did not apply to recipients of obscene material for use exclusively within the privacy of a recipient's home; consequently, he committed no crime. Instead, Johnson contended that § 1461 applied only to individuals who intended to circulate the obscene material relying heavily upon the opinion of a district court in *United States v. Sidelko,* 248 F.Supp. 813 (M.D.Pa.1965), to support his proposition to disregard the clear language of the statute.

Johnson was convicted under the portion of 18 U.S.C. § 1461 which in pertinent part states:

Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device or substance; ...

. . . .

Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section or section 3001(e) of title 39 to be nonmailable, or *knowingly causes to be delivered by mail according to the direction thereon,* ... shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such offense, and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.

*Id.* (emphasis added).

A well settled rule of statutory interpretation directs the court in the first instance to examine the language of the statute. "[O]nly the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language. When we find the terms of a statute unambiguous, judicial inquiry is complete, except in 'rare and exceptional circumstances.'" *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984) (citations omitted). *See also United States v. Premises Known as 8584 Brown Road,* 736 F.2d 1129 (6th Cir.1984). This court is of the opinion that the district court in *Sidelko* did not correctly apply this well established legal principle.

It is evident from a review of the plain language of the statute that the passage

"whoever ... knowingly causes to be delivered by mail according to direction" is clearly broad enough to encompass persons who order and receive obscene material for personal use and consumption and is not limited to persons who only place obscene material in the mail. The statute is unambiguous as to this conclusion. Consequently, this court is precluded from further investigation into other possible interpretations of the statute, unless there is any extraordinary showing of contrary intentions in the legislative history.

In reviewing the legislative history of § 1461, this court has found no expressed legislative intent to exclude persons who order and receive obscene material in the mail from the dictates of the statute. Although the statute was amended in 1958 to replace the term "whoever knowingly *deposits*" for "whoever knowingly *uses*" to resolve jurisdictional problems, there is no indication in the conference or senate reports which suggests an intent contrary to the plain language of the statute. S.Rep. No. 1839 and H.R. Conf.Rep. No. 2624, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Admin.News 4012–4018. This conclusion is consistent with the Ninth Circuit's interpretation of § 1461. In *United States v. Hurt*, 795 F.2d 765 (9th Cir. 1986), *modified on other grounds*, 808 F.2d 707 (1987), *cert. denied*, — U.S. —, 108 S.Ct. 69, 98 L.Ed.2d 33 (1987), the court determined the language "whoever knowingly uses the mails" to be intended to include persons who order and receive obscene material through the mail for their personal use and consumption. Consequently, Johnson's conduct of ordering and receiving child pornography in the mail for his private use was within the plain language of the statute.

■ Lastly, Johnson suggested that he did not possess the requisite scienter to violate 18 U.S.C. § 1461 because the government failed to prove he had knowledge of the character or nature of the advertisements and brochures received by him in the mail.

Section 1461 makes it a crime if a person "knowingly causes to be delivered by mail" any obscene material. 18 U.S.C. § 1461. In *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), the Court held that the defendant had the requisite scienter if he knew of the nature and character of the materials. *See Hurt*, 795 F.2d at 773; *United States v. Marchant*, 803 F.2d 174, 176 (5th Cir.1986).

Viewing the record in the light most favorable to the government, it is apparent that Johnson possessed sufficient knowledge to violate 18 U.S.C. § 1461. The record disclosed that Johnson was an experienced collector of pedophilia with an uncanny awareness of the practices and procedures employed by commercial distributors of obscene materials. For example, although claiming that he neither ordered nor expected to receive advertising brochures and pamphlets, Johnson testified that he was aware that: (1) commercial distributors of pornography were violating the law; (2) past orders placed by him with commercial distributors of child pornography would insure future receipt of mail advertisements promoting obscene materials, and the circulation of his name amongst other commercial distributors of obscenity; (3) absent his objection his name would remain upon those various mailing lists; and (4) the advertisement he was likely to receive would contain sexually explicit photographs of children. "When the receipt occurs at the invention or with the consent of the possessor, it is more difficult to camouflage the fulsome scent of forbidden knowledge." *Marchant*, 803 F.2d at 177.

In combination with the fact that he avidly collected pedophilia for a period of approximately ten years prior to his apprehension, the direct evidence of Johnson's knowledge of the practices and procedures commonly employed by commercial distributors of obscene materials in marketing their merchandise proved him to be a sophisticated and willing participant who was predisposed to violating the law to further his activities. Therefore the district court properly concluded that Johnson possessed the requisite scienter to have violated § 1461.

Accordingly, the judgment of the district court that Johnson was guilty of sending child pornography through the mails in violation of 18 U.S.C. § 2252, and guilty of fifteen counts of causing obscene materials to be delivered through the mails in violation of 18 U.S.C. § 1461 is AFFIRMED.

MERRITT, Circuit Judge, dissenting.

I disagree with the majority's conclusion that 18 U.S.C. § 1461 permits the conviction of one who receives in the mail child pornography for personal use rather than for circulation to others. My examination of the statutory language and legislative history of § 1461 reveals that the Ninth Circuit erred in *United States v. Hurt*, 795 F.2d 765 (1986), modified on other grounds, 808 F.2d 707, *cert. denied*, —— U.S. ——, 108 S.Ct. 69, 98 L.Ed.2d 33 (1987), when it upheld the conviction of a recipient of obscene material. The reasoning is more persuasive in *United States v. Sidelko*, 248 F.Supp. 813 (M.D.Pa.1965), which concluded that Congress did not intend for § 1461 to apply to persons who order and receive obscene material for personal use.

In determining the meaning of a statute, courts must first look to the plain language adopted by Congress. If the statute's language is unambiguous, "ordinarily it is to be regarded as conclusive unless there is 'a clearly expressed legislative intention to the contrary.'" *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845 (1983) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

The relevant language of § 1461 provides:

> Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared ... to be nonmailable, or *knowingly causes to be delivered by mail according to the direction thereon* ... or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof ... shall be fined not more than $5,000 or imprisoned not more than ten years....

(emphasis added). Counts 2–16 of the indictment in this case state that the defendant "did knowingly cause to be delivered by mail according to the directions thereon" several obscene items. App. 13–21. The question before us is whether Congress intended for this "cause" provision of § 1461 to apply to recipients, as well as to senders, of obscene material.

The language of the "knowingly causes to be delivered" provision does not specify whether its application is limited to senders. On the one hand, the provision may apply to receivers of obscene material for personal use because, in one sense, they "cause to be delivered" certain materials when they request distributors to mail obscene materials. On the other hand, the statute can be interpreted to apply only to senders of obscene material and not to receivers. It is the sender who literally "causes to be delivered by mail" material which he himself puts in the mail or causes another to put in the mail.

The next significant phrase contained in the eighth paragraph of § 1461 suggests that the "knowingly causes to be delivered" provision applies only to senders. The criminal act described in this paragraph is: "or knowingly takes any such thing from the mails for the purpose of circulating...." This provision obviously applies to receivers of obscene material; but not all receivers, just those who intend to *circulate* the material. Since this provision separately and explicitly deals with receivers, it is certainly arguable that the previous provisions deal only with senders.

The words "according to the direction thereon," following "knowingly causes to be delivered by mail" lead to the same conclusion because receivers' "directions" or requests, are not *on* the mailed material. If receivers are contemplated by this provision, then these five words are meaningless. By making the words "according to direction thereon" apply to senders only, we can make some sense of the language. The address placed on the mailed material by the sender would constitute the "direction thereon" under the statute.

## I.

This ambiguity in the plain meaning of the language leads me to the view that an investigation of the legislative history on this point may illuminate the intended meaning. The majority states that its examination of § 1461's legislative history revealed "no expressed legislative intent to exclude persons who order and receive obscene material in the mail." Opin. 13. My research into the legislative history of the "knowingly causes to be delivered" provision reveals that Congress did not intend for it to cover receivers.

Section 1461 was amended in 1958 to include the "knowingly causes to be delivered" provision. Previously, the applicable paragraph of § 1461 was divided into a "sender" clause and a "receiver" clause:

> [1] Whoever knowingly deposits for mailing or delivery, anything declared by this section to be nonmailable, or [2] knowingly takes the same from the mails for the purpose of circulating ... shall be fined not more than $5,000 or imprisoned....

18 U.S.C. § 1461 (1952); H.R.Rep. No. 1614, 85th Cong., 2d Sess. 7–8 (1958). In 1953, the Tenth Circuit in *United States v. Ross*, 205 F.2d 619, interpreted the sender provision of § 1461 as limiting prosecution of those who mailed obscene material to jurisdictions in which the mail was deposited. The court affirmed dismissal of an indictment seeking to prosecute defendants in Kansas, where obscene mail sent by them was delivered. Defendants were prosecuted in Kansas because their earlier prosecution in California, where the mail was deposited, was dismissed when a court ruled that the mailed material was not obscene. H.R.Conf.Rep. No. 1614, 2624, 85th Cong., 2d Sess., *reprinted in* 1958 U.S. Code Cong. & Admin.News 4016. The Tenth Circuit held that the sender provision did not establish a continuing crime and thus the offense occurred in the jurisdiction where the deposit was made. *Ross*, 205 F.2d at 620–21. The court explained:

> We think there is a clear distinction between a deposit for mailing or delivery and the use of the mails.... [T]he un-lawful act defined in § 1461 is the deposit for mailing and not a use of the mails which may follow such deposit. That act is complete when the deposit is made and is not a continuing act.

*Id.* at 621.

As a direct response to the *Ross* opinion, Congress amended § 1461's sender provision for the explicit purpose of making the offense of "deposits for mailing" a continuing offense. *See* H.R.Rep. No. 1614, 85th Cong., 2d Sess. 3–4; S.Rep. No. 1839, 85th Cong., 2d Sess. 2–4, *reprinted in* 1958 U.S. Code Cong. & Admin.News 4013–14; H.R. Conf.Rep. No. 2624, *reprinted in* 1958 U.S. Code Cong. & Admin.News 4016–17. Congress sought to authorize the prosecution of depositors in jurisdictions where the material was delivered, or where it was mailed. *Id.* Another impetus for expanding the venue of the sender provision was the Supreme Court's decision in *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). 104 Cong.Rec. 1396 (1958). In *Roth*, Justice Brennan announced that an appropriate standard for judging obscenity is "whether to the average person, *applying contemporary community standards,* the dominant theme of the material taken as a whole appeals to prurient interest." *Id.* at 489, 77 S.Ct. at 1311 (emphasis added). Congress wanted defendants prosecuted as "smut peddlers" in districts where obscene material was delivered because these were the areas harmed by the offense. 104 Cong.Rec. 9530. As explained below, the sender provision amendment was never intended to apply to receivers of obscene material. On the contrary, Congress viewed receivers— children and "adults of low mentality"—as the victims of solicited and unsolicited obscene materials. 104 Cong.Rec. 8994.

In early 1958, both the House and the Senate introduced bills for the § 1461 amendment. The bills were similar, but differed in one major respect. The Senate bill, introduced by Senator Kefauver, sought to permit prosecution "for the sending of nonmailable matter through the United States mails, not only at the place where the mail is deposited, as under the

existing law, but also at the place where the mail is received." 105 Cong.Rec. 6865. The House bill intended to expand the venue of the sender provision to include not only the judicial districts where the mail was deposited and delivered, but also the districts in which the mail passed through en route to its destination. 104 Cong.Rec. 8991. The House bill's language specifically adopted the language suggested in *Ross,* that whoever "uses the mails" would commit a continuing offense, allowing prosecution in several districts. *Id.;* H.R.Rep. No. 1614 at 7. The House Bill contained the specific provision disputed in this case, "knowingly causes to be delivered." *Id.* No significant changes were proposed for the receiver provision. The Senate version also contained the "knowingly causes to be delivered" phrase. S.Rep. No. 1839 at 1, 1958 U.S.Code Cong. & Admin.News 4012. Like the House, the Senate did not propose changes for the receiver provision. After a conference between the House and Senate, Congress passed the House version of the sender provision amendment. *See* H.R. Rep.Conf. No. 2624 at 1; 104 Cong.Rec. 17,832.

The majority states that it gleaned its interpretation of the legislative history of § 1461 from the Senate and Conference Reports. Opin. 13. Although it is true that the reports do not indicate that receivers are excluded from the sender provision amendment, it is also true that the only purpose for the amendment was to expand the venue of the former sender provision. There is no indication whatsoever in any of the reports that receivers would be included in the sender provision amendment.

The Senate Report states that the purpose of the proposed amendment is to:

> make it possible to prosecute violators of section 1461 of title 18 of the United States Code (*mailing of obscene* or crime-inciting *material*) not only at the place at which the objectionable matter is mailed, but also at the place of address or delivery.

S.Rep. No. 1839 at 2, 1958 U.S.Code Cong. & Admin.News 4013 (emphasis added). "Violators" are those who *mail* obscene material. The report's explanation that the amendment was brought to avoid the *Ross* problem further reveals that the "violators" in this context are the senders, and not the receivers, of obscene material. *Id.* at 2–4, 1958 U.S. Code Cong. & Admin. News 4013–4014. Nowhere in the Senate Report is there any mention of an interest in expanding the sender provision's coverage to include receivers. The report clearly indicates that the Senate viewed the senders as the evildoers, and the receivers as the victims: "The main evil to be combatted is the harm done to those who are exposed to obscene material at the point of receipt." *Id.* at 3, 1958 U.S.Code Cong. & Admin.News 4013. Letters accompanying the report also show that the proposed amendment only applied to senders. Representative Celler's letter states:

> This bill will amend section 1461 ... so as to *make the deposit of obscene matter* in the mails *a use of the mails....* The importance of this decision [*Ross* ] rests in the fact that it is sometimes difficult to obtain a *conviction for the mailing of obscene matter* in certain jurisdictions.

*Id.* at 4, 1958 U.S.Code Cong. & Admin. News 4014 (emphasis added).

Similar to the Senate Report, the House Report also states that the purpose of the amendment is to:

> make it possible to prosecute violators of section 1461 ... (*mailing of obscene* or crime-inciting material)....

H.R.Rep. No. 1614 at 2 (emphasis added). Accompanying letters and statements to the Report also support the view that the bill would expand the venue for obscenity senders and not receivers. The General Counsel of the Post Office Department's position is included in the Report:

> The purpose of the bill ... is that *persons mailing obscene literature* ... may be prosecuted in the district in which the *mailing took place,* in any district through which the mail passed, and in the district where it is delivered.

*Id.* at 6 (emphasis added).

The Conference Report clearly states that § 1461 was being amended "to make the *mailing* of obscene matter a continuing

offense." H.R.Conf.Rep. No. 2624 at 3, *reprinted in* U.S. Code Cong. & Admin. News 4016. Explaining that the amendment was a direct response to *Ross*, the report states: "[t]he importance of this decision rests in the fact that it is sometimes difficult to obtain a conviction *for the mailing of obscene matter* in certain jurisdictions." *Id.* (emphasis added). The conference agreed on the original House bill indicating that the "purveyors" of obscene material committed a continuing crime when they used the mail for their deeds. *Id.* at 1, 1958 U.S.Code Cong. & Admin.News 4016.

The numerous pages of congressional statements regarding both houses' proposals also reveal that there was virtually no opposition to the proposed amendment to the sender provision of § 1461. Over fifteen congressmen made lengthy statements on the House and Senate floors in favor of the amendment. The statements reveal a uniform belief that the amendment to the sender provision would expand the jurisdictions in which the "obscenity merchants" could be prosecuted. 104 Cong. Rec. 8991. Senator Kefauver's statements explain why the sender provision was amended, and to whom the amendment applied:

This restriction [from *Ross* ] has seriously impaired the ability of the Post Office Department and the Department of Justice to fight the interstate pornography racket. The greatest impact on the community is often felt at the place where the objectionable material is received. It is frequently in the community where the matter is received that the largest number of complaints are made and the greatest impetus to prosecution exists.

A heavy percentage of objectionable material is being deposited in the mails in the Los Angeles area, resulting in the funneling of a large number of prosecutions into one already overcrowded federal jurisdiction. Many of these cases have been acted on by one judge in the Southern California Federal jurisdiction, with the result that his interpretation of the law has become almost a controlling factor on a national footing in the enforcement of section 1461. The proposed

change in the law simply implements section 3237 of Title 18, United States Code Annotated, which provides for prosecution for material sent through the mail "in any district from, through, or into which such commerce or mail matters move."

. . . . .

The strengthening of the criminal statute with respect to the *sending of obscene or objectionable matter* ... is necessitated by the indiscriminate use of commercial mailing lists by persons in the mail-order pornography business.

104 Cong.Rec. 6865 (emphasis added). The remarks of Representative Sullivan explain that after *Ross,*

[s]mart smut peddlers now base their operations largely in Los Angeles and New York City. Experience has shown them that courts and juries there are lenient with them. In short, they are free to shop around and settle in a district where the judges or jurors are broadminded about their sleazy kind of business.

This year, Congress is going to try to plug some of these loopholes.

*Id.* at 9530. Representative Saylor stated:

I intend to support it [the bill] if only to serve *notice on the purveyors of obscenity* that Congress resents their diabolical business and is determined to stop it.

*Id.* at 7672 (emphasis added). And Representative Feighan explained:

Certainly, while the technical crime may have been consummated in a distant location *by the deposit of such pornography in the mail,* the impact and ramifications of this vicious criminal act were found in the minds and morals of those who were subjected to it upon receipt. . . . Merely to permit the moral, God-fearing members of the community to *pass judgment upon purveyors of filth* who would destroy the homes of a community ... should strike fear in no one's heart other than those who fear justice and the loss of *degrading profit* in human misery.

*Id.* at 8994 (emphasis added). The numerous floor statements of members of Congress reveal that they were interested in prosecuting the purveyors or senders of

obscene material, and not the receivers. *See, e.g., id.* at 19,842, 17,832, 15,611, 9530, 8991–94, 7672, 6626.

Hearings were also conducted on the House's proposed amendment to the sender provision of § 1461 at which 25 witnesses testified. *Mailing of Obscene Matter, 1958: Hearings on H. 6239 et al. Before the Subcomm. No. 1 of the House Comm. on the Judiciary,* 85th Cong., 2d Sess. 1–100 (1958). Twenty-two of the witnesses strongly favored the proposed amendment. Those who opposed the bill, such as the American Book Publishers Council, objected to the possibility that a jurisdiction with a narrow view of obscenity could determine the legality of a work for all other jurisdictions in the country. *See id.* at 57. None of the witnesses' statements indicate that the proposed venue amendment would apply to receivers of obscene material.

In sum, the reports, floor statements and hearing testimony uniformly reveal that in amending the sender provision of § 1461, Congress was simply attempting to expand the venue for prosecutions of "smut peddlers." Nowhere in this voluminous legislative history is there even mention of the view that the amendment should also apply to receivers of obscenity. The receiver provision itself was left untouched by the sender provision amendment.

This study reveals that the majority is attempting to create a new offense that Congress did not intend to criminalize—receipt of obscene material for personal use.

This interpretation of § 1461 through its legislative history is reinforced by the fact that nine of the counts in the indictment here charge that the receiver "did knowingly cause to be delivered by mail" *advertisement* sheets, that were themselves obscene, for obscene literature. App. 13–20. Congressional statements made during floor discussion of the sender provision amendment indicate that Congress specifically did not intend to criminalize the receipt of advertisements for obscene material. *See* 104 Cong.Rec. 15,610, 8991–92, 6865. Recipients of these advertisements were viewed as the victims of a nationwide obscenity sales campaign. Representative Reuss explained that Americans

are being given the "hard sell" to buy obscene photographs and movies.... [*D* ]irect-mail advertisements—often more provocative than the product they peddle—*are sent to our teen-agers each year.*

To date, *no one,* from post-office official to parent, *has been able effectively to curb this mushrooming trade in pornography—no one,* although it is abhorrent to us all.

*Id.* at 8992 (emphasis added). Representative Keating stated:

It is estimated *50 million direct-mail advertisements for such [obscene] material* were circulated into American homes last year.

Promoters are raking in enormous profits, often apparently in the millions. *Their methods are devious and deceptive. They prey upon the innocent and unsuspecting.* Their filthy produce is contaminating young minds all over our country.

*Id.* at 8991 (emphasis added). Applying this legislative history to the facts of this case demonstrates that Congress never envisioned that the victim's conduct in receiving advertisements for obscene material would be criminal.

## II.

Counts 2–16 of the indictment charge defendant with violating 18 U.S.C. § 2 as well as § 1461. Since mere receipt of obscene material for personal use is not a violation of § 1461, the government must show that defendant violated § 2. Section 2 provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Although in its briefs the government has not described exactly how defendant violated § 2, presumably the theory is that defendant's mere receipt of the obscene mate-

rial shows that he aided and abetted the sending of the material—a violation of § 1461.

The legislative history discussed above reveals that Congress intended the prosecution of senders of obscene material or of receivers who circulate the material. Defendant does not fall into either category. His conviction under § 2 for aiding and abetting the sending of obscene material by his mere receipt contravenes Congress's intention that only certain receivers can be prosecuted under § 1461—those who circulate the material.

This situation is similar to *Gebardi v. United States*, 287 U.S. 112, 123, 53 S.Ct. 35, 38, 77 L.Ed. 206 (1932). In *Gebardi*, the Court reversed the conviction of a female defendant who allegedly conspired to violate the Mann Act by consenting to her transportation across state lines. Applying *Wharton's Rule*, the Court reasoned that Congress did not envision that a participant or victim in the Mann Act crime could be indicted for conspiracy to commit the crime—even if she consented. *Id.* The Court explained:

> [W]e perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished. We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter. *It would contravene that policy to hold that the very passage of the Mann Act effected a withdrawal by the conspiracy statute of that immunity which the Mann Act itself confers.*

*Id.* (emphasis added).

Applying *Gebardi's* reasoning and *Wharton's Rule* to this case, it is obvious from the legislative history that Congress only intended to criminalize a certain kind of receipt—when the receiver intended to criminalize the material. If the receiver can be convicted of violating § 2 by aiding and abetting the sending of obscene material, then a different type of receipt would be criminalized. Congress's intention was clear: senders or receivers who circulate violate § 1461. The government's reformulation of a § 1461 offense through § 2 contradicts the result Congress explicitly intended.

### III.

I would not only reverse defendant's convictions under 18 U.S.C. §§ 1461 and 2, but I would also reverse his conviction under § 2252 and remand the case for a new trial on this charge. The spillover effect of the voluminous evidence admitted to prove counts 2–16 of the indictment severely prejudiced defendant's entrapment defense for the § 2252 charge. Given the extremely strong entrapment showing defendant has made, I would remand for a new trial on the § 2252 offense.