IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 27, 2001 Session

## STATE OF TENNESSEE v. F. CHRIS CAWOOD

**Direct Appeal from the Circuit Court for Roane County**
**No. 12180     Buddy D. Perry, Judge**

---

**No. E2000-02478-CCA-R3-CD**
**February 25, 2002**

---

The Defendant was indicted for two counts of promoting prostitution and for two counts of patronizing prostitution. Following a bench trial, the Defendant was convicted of two counts of attempting to patronize prostitution, a Class C misdemeanor; sentenced to thirty days suspended; and fined $50.00 for each count. The Defendant now appeals, arguing the following: (1) that the evidence is insufficient to support the convictions; (2) that the conduct by law enforcement in this case was so outrageous as to constitute a defense; (3) that a fatal variance exists between the indicted charges and the evidence presented at trial; (4) that the trial court erred in failing to suppress the audio and video tape evidence that was introduced at trial; and (5) that the trial court erred in denying the Defendant's motion to seal the audio and video tape evidence in this case. Concluding that the evidence is insufficient to support the convictions, we reverse the judgment of the trial court and dismiss the charges against the Defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Patrick C. Cooley, Kingston, Tennessee, for the Appellant, F. Chris Cawood.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; and J. Michael Taylor, District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I. Facts

At trial, Tamela Clark testified that in the summer of 1998, she retained the services of the Defendant, an attorney, to represent her in her divorce case. The divorce was granted in February 1999, but Ms. Clark experienced post-divorce legal difficulties with her former husband and contacted the Defendant in the spring of 1999 for further legal services. Ms. Clark testified that she

met with the Defendant late one afternoon that spring to discuss her legal problems pertaining to her former spouse. Ms. Clark testified that as she was getting ready to leave, the Defendant "began masturbating and told [her] he did not want sex, he just wanted [her] to watch him and he would knock $100.00 off [her] bill." Ms. Clark remained in the office for "just maybe five minutes or so" while the Defendant masturbated himself to climax. Ms. Clark testified that she then left the office and later talked to a "girlfriend that lives out-of-state and told her what had happened . . . ." She did not, at that time, report the incident to anyone in law enforcement.

Ms. Clark testified that a similar incident occurred when she returned to the Defendant's office in late April 1999. Again, the Defendant and Ms. Clark discussed legal matters, and the Defendant then masturbated in front of Ms. Clark. According to Ms. Clark, the Defendant again stated that he did not want to have sex with her, but he would "knock $100.00 off [her] bill if [she] would sit and watch him." She further testified that the Defendant "walked up to the front desk and marked it off my bill."

Ms. Clark testified that a few days after the second incident, she told a Roane County General Sessions Judge about the Defendant's conduct and was referred by the judge to the Roane County District Attorney's office. Eventually, Ms. Clark talked to Linda Booth, a Criminal Investigator with the Roane County Sheriff's Department.

On May 10, 1999, pursuant to an appointment she made, Ms. Clark arrived at the Defendant's law office with a hidden video camera in her purse and a hidden audio "wire" taped to her leg, both of which were supplied to Ms. Clark by various law enforcement personnel. After a discussion concerning the post-divorce legal action involving Ms. Clark's former husband, the Defendant allegedly asked Ms. Clark again to watch him masturbate. According to Ms. Clark, the Defendant also asked her to hit him on the buttocks with a belt, and she did so. At his request, she also pinched his nipples as he masturbated. Ms. Clark testified that after completing this act, the Defendant rearranged his clothes and walked out front where he "marked the money off [her] bill." She then left the Defendant's office. Ms. Clark later met with law enforcement personnel who retrieved the audio "wire" and the purse containing the video camera. The video camera had not worked during Ms. Clark's encounter with the Defendant, but the "wire" did, and an audio tape of this encounter was made.

Ms. Clark testified that on May 18, 1999, she again met with various law enforcement personnel and was "wired up" prior to another appointment with the Defendant. According to Ms. Clark, a similar event involving basically the same activities occurred. Ms. Clark testified that the Defendant did not, on any occasion, ask her to have sexual intercourse with him. At the meeting between Ms. Clark and the Defendant on May 18, 1999, the video camera and the audio tape were both functioning properly, and a video tape and an audio tape of this encounter were made.

Linda Booth, a criminal investigator with the Roane County Sheriff's Department, testified that she was contacted by Ms. Clark in the latter part of April or early part of May 1999. Ms. Booth then made arrangements to have Ms. Clark electronically wired for audio and video recording. On May 10, 1999, Ms. Booth and several other law enforcement officers met with Ms. Clark at the

Tennessee Bureau of Investigation office in Kingston, Tennessee. The law enforcement personnel followed Ms. Clark to the Defendant's law office after "wiring up" Ms. Clark. Ms. Booth and the other law enforcement agents parked in a vacant lot near the Defendant's law office while Ms. Clark met with the Defendant. An audio recording was made of the meeting between Ms. Clark and the Defendant, but the video camera did not work. The audio recording was entered into evidence at the trial.

This same procedure was basically repeated on May 18, 1999. On this occasion, both the audio and the video devices worked properly, and a video tape and an audio tape were admitted into evidence. On cross-examination, Ms. Booth agreed that Ms. Clark had raised the issue of money with the Defendant on both occasions in which law enforcement were involved. Ms. Booth denied instructing Ms. Clark to bring up the issue of money. Ms. Clark maintained on cross-examination that she was not a prostitute, that she was not in the business of prostitution, and that in May of 1999 she had not been in the business of prostitution.

Mary Webb, the Defendant's secretary in his law office, testified for the defense. She testified that Ms. Clark wore "tight fitting clothes" and was "flirtatious" toward the Defendant. Ms. Webb testified that she suspected that something might be going on between the Defendant and Ms. Clark. Ms. Webb testified that the Defendant never requested that Ms. Webb set Ms. Clark's appointment for after regular business hours.

The Defendant testified that he had practiced law in Roane County for twenty-seven years. He testified that Ms. Clark came to his office on August 10, 1998 and retained him to represent her in a divorce. He quoted her a "flat fee" of $1,600.00, of which $250.00 was paid on August 10, 1998. As the December trial date approached, the Defendant "saw that he wasn't going to be paid by the time of the trial, so [he and Ms. Clark] executed a promissory note for the $1,350.00 that [Ms. Clark] mentioned earlier, and that was to be paid at a rate of $100.00 per month."

The Defendant testified that Ms. Clark always wore tight jeans and usually wore a blouse that was cut at the midriff. He further testified that "it appeared she wasn't wearing bras." The Defendant also interpreted Ms. Clark's behavior as flirtatious.

The Defendant testified that on the Monday following the December 10, 1998 divorce hearing, Ms. Clark came to his office without an appointment and appeared to be happy with the outcome of the divorce. The Defendant testified that he and Ms. Clark hugged and kissed and "started into a little activity there on December 14, that included kissing her breasts, . . . her kissing me and whatever, and her only concern at that time was, Will your secretary come in and I told her, 'No I don't think so.'" The Defendant testified that in the middle of January 1999, Ms. Clark came to his office, and she and the Defendant engaged in consensual sexual activity. On that same occasion, according to the Defendant, Ms. Clark made a regular monthly payment on her account ($100.00). The Defendant testified that in February of 1999, he began representing Ms. Clark in post-divorce matters, for which it would have been customary for him to charge additional fees. He testified that he did not charge additional fees because of the personal relationship that had

developed between Ms. Clark and him. He also felt that she was having financial difficulties because in the final divorce decree, she was ordered to pay "about three mortgages on her house."

The Defendant testified that once or twice a month he and Ms. Clark engaged in activity similar to what occurred as a basis for the charges against him. This activity continued in February, March, and April of 1999. The Defendant testified that early in April, Ms. Clark offered to have sexual relations with him for $400.00. He testified that he did not give her $400.00 and that they "didn't have sexual relations." The Defendant testified that he never thought Ms. Clark was a prostitute. The Defendant testified that in April, Ms. Clark told him, "I can still have sex with you if you'll wipe out my whole account." The Defendant stated, "Again, I didn't say yes or no or nothing. We just went ahead and did some things and then later on I said don't worry about your monthly payment, I'm not going to try to collect it." The Defendant testified that as Ms. Clark was leaving on one occasion, he said, "Don't worry about your April payment, I'll mark it off." The Defendant testified that with regard to the two incidents for which he was convicted, Ms. Clark was the one who brought up the idea of deducting money from her bill. The Defendant denied ever refusing to file legal documents or refusing to do legal work for Ms. Clark unless she continued with a sexual relationship. The Defendant testified that he credited Ms. Clark's bill because he still had feelings for her. Specifically, he stated, "I thought she was in a hard time financially. If that would help her to give her a credit on that, that was fine with me to give her a credit. I'm not going to live or die on $50.00 or $100.00, and somebody in her financial position, if that were to get her by until the next month, that was fine." The Defendant further stated, "I have never had any intent to patronize prostitution. I never thought she was a prostitute. I thought we had a personal relationship, that I shouldn't have had with a client, that got out of hand, that I was helping her on those two or three occasions, so she could pay her monthly bills and not have to pay me. No, I never thought this was illegal."

In rebuttal, Ms. Clark testified that she had not had consensual sex of any type with the Defendant and that her first sexual encounter with the Defendant occurred in the spring of 1999. She denied offering to have sex with the Defendant for $400.00, and she basically reaffirmed that there was no other activity of a sexual nature between her and the Defendant other than what she had described in her initial testimony.

## II. Analysis

### A. Sufficiency of the Evidence

The Defendant was convicted of two counts of attempt to patronize prostitution. Patronizing prostitution is generally classified as a Class B misdemeanor. See Tenn. Code Ann. § 39-13-514(b)(1). Therefore, attempting to patronize prostitution is classified as a Class C misdemeanor. See id. § 39-12-107(a).

"'Patronizing prostitution' means soliciting or hiring another person with the intent that the other person engage in prostitution, or entering or remaining in a house of prostitution for the purpose of engaging in sexual activity . . . ." Id. § 39-13-512(3). "'Prostitution' means engaging

-4-

in, or offering to engage in, sexual activity as a business or being an inmate in a house of prostitution or loitering in a public place for the purpose of being hired to engage in sexual activity . . . ." Id. § 39-13-512(5). "'Sexual activity' means any sexual relations including homosexual sexual relations." Id. § 39-13-512(6).

"Criminal attempt" is defined as follows:
A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
(1)     [i]ntentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as a person believes them to be;
(2)     [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
(3)     [a]cts with intent to complete a course of action or cause a result that would constitute the offense under the circumstances surrounding the conduct as a person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.
Id. § 39-12-101(a).

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. Although the Defendant was convicted in a bench trial, the findings of the trial judge who conducted the proceeding carry the same weight as a jury verdict. State v. Tate, 615 S.W.2d 161, 162 (Tenn. Crim. App. 1981). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The State argues in its brief that the Defendant attempted to hire Ms. Clark with the intent that she engage in sexual activity as a business, i.e., with the intent that Ms. Clark engage in sexual activity in exchange for monetary compensation in the form of deductions from her outstanding balance owed for legal services. Although the term "business" is not defined in the definitions section of our criminal code, "business" is defined in The American Heritage Dictionary of the English Language as "[t]he occupation, work, or trade in which a person is engaged or a specific occupational pursuit." The American Heritage Dictionary of the English Language (4th ed. 2000). As the Defendant argues in his brief, both Ms. Clark and the Defendant denied that Ms. Clark was a prostitute or in "business" as a prostitute. There was no evidence that she in any way pretended to be a prostitute. There was no testimony from any witness characterizing Ms. Clark as a prostitute. Perhaps more importantly, the record is void of any evidence that Ms. Clark engaged in or offered to engage in sexual activity as a business. There is no evidence that the Defendant attempted to solicit or hire Ms. Clark with the intent that Ms. Clark engage in sexual activity as a business. The dictionary definition of "business," and for that matter the "common sense" definition of business, does not, in our view, include the type of sexual activity that occurred between the Defendant and Ms. Clark. Even considering the evidence in the light most favorable to the State, that is, that the Defendant attempted to solicit or hire Ms. Clark with the intent that Ms. Clark engage in prostitution (which by definition would require Ms. Clark to engage in sexual activity as a business), we cannot conclude that the Defendant's intent to credit Ms. Clark's account after each act involving "sexual relations" would result in Ms. Clark's engaging in sexual activity as a "business." If the sexual activity that occurred between the Defendant and Ms. Clark does not qualify as prostitution, then it logically follows that the Defendant was not guilty of attempting to patronize prostitution.

We note that in State v. Lane Pulley, No. M2000-02609-CCA-R3CD, 2001 WL 1597740 (Tenn. Crim. App., Nashville, Dec. 14, 2001), a panel of this Court recently adopted, for purposes of definition only, the definition of "business" contained with the provisions of the Business Tax Act. Id. at *3 (citing Tenn. Code Ann. § 67-4-701). Tennessee Code Annotated § 67-4-702(1) defines a "business," in pertinent part, as follows: "'Business' includes any activity engaged in by any person, or caused to be engaged in by the person, with the object of gain, benefit, or advantage, either direct or indirect. 'Business' does not include occasional and isolated sales or transactions by a person not routinely engaged in business."

Although the issue in the Pulley case involved the sufficiency of evidence in a deceptive business practice case, an application of the Business Tax Act definition of "business" to this case yields the same results. The first sentence of the definition would support the State's position. However, the second sentence, in our view, would exclude the conduct between the Defendant and Ms. Clark from the definition of "business."

We conclude that the evidence is insufficient to convict the Defendant. Nevertheless, we will briefly address the additional issues raised in this appeal.

B. Outrageous Police Conduct Defense

The Defendant argues on appeal that the conduct of the police in this case was so outrageous as to constitute a violation of his right to fundamental fairness that is inherent in his right to due process. Both the State and the Defendant point out that the Tennessee Supreme Court has implicitly recognized the validity of an "outrageous conduct" defense. See State v. George Lewis Michaud, No. 01C-01-9002-CR-00044, 1992 WL 41710 at *2 (Tenn. Crim. App., Nashville, Mar. 6, 1992) (citing Hyde v. State, 174 S.W. 1127 (Tenn. 1915)). The Tennessee Supreme Court has concluded that if the government or its agent suggests the criminal design or assists the perpetrator toward the commission of the crime in some active manner, i.e., is inextricably entwined in the commission of the offense, the government's participation is then a defense. Id. (citing Hyde, 174 S.W. at 1130). In this case, the State advances criteria considered relevant by the Sixth Circuit Court of Appeals "to be taken into consideration when determining if police conduct impinged constitutional due process protections." United States v. Johnson, 855 F.2d 299, 304-05 (6th Cir. 1988). The factors are as follows: "(1) the need for the type of government conduct in relationship to the criminal activity; (2) the preexistence of a criminal enterprise; (3) the level of direction or control of the criminal enterprise by the government; [and] (4) the impact of the government activity to create the commission of the criminal activity." Id. at 305.

Although we have determined that no crime occurred in this case, if we assume that the Defendant did attempt to patronize prostitution under the circumstances presented by the evidence in this case, we conclude that the Defendant's defense of "outrageous [police] conduct" has merit. In our view, Ms. Clark clearly assisted the Defendant toward the commission of the crime in an active manner. Her conduct was inextricably entwined in the commission of the offense. Further, when we examine the other relevant criteria, the evidence in this case indicates that there was significant participation on the part of the State in the direction and control of the criminal enterprise, and the impact of the State activity was to create the commission of the crime not only on the part of the Defendant, but also on the part of the victim. Thus, Johnson factors three and four weigh heavily in favor of the Defendant. See id. Additionally, the Defendant makes a persuasive argument that factor two, see id., weighs in favor of the "outrageous conduct" defense, as the evidence supports the argument that the criminal enterprise did not exist prior to the "undercover" activity by Ms. Clark acting as an agent of the police. Although the use of an undercover agent or paid informant by the government has long been held not to violate a defendant's right to due process, see United States v. Russell, 411 U.S. 423, 432 (1973), we are convinced in this case that the Defendant's right to due process was violated by the conduct of the police. With the unusual factual scenario involved in this case, the police participation constitutes a defense. Therefore, had we determined that the evidence was sufficient to convict the Defendant, we would have nonetheless reversed his conviction because his due process rights were violated.

Although the State correctly points out in its brief that the additional conduct of the police in inappropriately showing the video-taped evidence occurred after the offense was committed, we nonetheless believe that this inappropriate conduct by the police bolsters the Defendant's claim that his defense of "outrageous conduct" by the police has merit.

## C. Variance Between the Indictment and the Evidence

The Defendant argues that because the indictment alleges that the Defendant himself engaged in sexual activity as a business, a fatal variance exists between the indictment and the actual evidence that was presented at trial. The State argues that the indictment sufficiently informed the Defendant of the charges against him to allow the preparation of a defense and protected him from a second prosecution. We agree with the State.

Our supreme court held that unless substantial rights of the defendant are affected by a variance, the defendant has suffered no harm. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). "[A] variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense . . . ." Id.

We do not believe that the Defendant in this case could have reasonably believed that he was charged with engaging in sexual activity as a business with himself. In our view, the indictment sufficiently informed the Defendant of the charges against him under the Moss test, see id. and the Defendant is not in danger of being prosecuted a second time for the same offense. Therefore, we find that the variance in the indictment in this case is harmless error. This issue is without merit.

## D. Suppression of Audio and Video Evidence

The Defendant argues on appeal that the trial court "erred in allowing the audio and video taping of the incident of May 18, 1999, to be introduced into evidence." In our view, this issue is without merit. The law enforcement officers equipped Ms. Clark with video equipment and audio equipment which was used to monitor and record the activities of the Defendant and Ms. Clark. As the State points out in its brief, this type of investigative work is sanctioned by Tennessee Code Annotated § 39-13-601. Ms. Clark was fully aware of and consented to the use of the audio and video equipment used to record her communications with the Defendant. The Defendant invited Ms. Clark into his office and freely and voluntarily communicated with her. This issue is without merit.

## E. Sealing of Audio and Video Evidence

The Defendant argues in his brief that the trial court erred in denying the Defendant's motion to seal the audio and video evidence "so that they would not be made public." The Defendant also suggests in his brief that this Court should place the audio and video evidence under seal. As authority for this request, the Defendant cites Tennessee Code Annotated § 40-6-304(f)(1), which is part of the statute in Tennessee that deals with wiretapping and electronic surveillance. The State responds in its brief that the terms of Tennessee Code Annotated § 40-6-304(f)(1) providing for the confidentiality and sealing of intercepted communications are limited to communications intercepted pursuant to an order of electronic surveillance. We agree with the State. This issue is without merit.

### III. Conclusion

For the reasons previously stated, we conclude that the judgments of the trial court must be reversed and that the charges against the Defendant should be dismissed. It is so ordered.

_____
ROBERT W. WEDEMEYER, JUDGE