895 F.2d 1415
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Allen Arthur PORTER, Defendant-Appellant.
 Nos. 89-1339, 89-1473.
 United States Court of Appeals, Sixth Circuit.
 Feb. 20, 1990.
 
 Before DAVID A. NELSON and BOGGS, Circuit Judges, and FRANK J. BATTISTI, District Judge.*
 PER CURIAM.
 
 
 1
 Allen A. Porter was convicted by a jury of knowing receipt of child pornography, in violation of 18 U.S.C. Sec. 2252(a)(2). On appeal, we affirm the conviction.
 
 
 2
 As part of a United States Customs Service project known as "Operation Borderline,"[1] designed to pierce the child pornography industry, federal agents mailed Porter a brochure which purportedly offered child pornography. The mailing stated:
 
 Hello Lolita Collector:
 
 3
 You have been recommended from a reliable contact in which you have done business with. Because you are a trusted and proven customer, we offer you these special selections.
 
 
 4
 As a serious collector, you are aware of the worldwide ban and intense enforcement on this type of material. Accordingly, what was legal and commonplace is now an "underground" and secretive service in order to continue serving collectors.
 
 
 5
 This environment forces us to take extreme measures to protect us and to insure your delivery. We have been serving customers the world over for many years and are continuing to do so. To continue, we offer these selections and delivery on the following basis only.
 
 
 6
 The brochure offered photographs of "boys and girls in sex action" and "[y]oung boys in sex action." Other titles included "Lolita," "School Girls and Boys," "Lolitas Who Love Pissing," "Loving Children," "Lesbian Lolita," "Life Boy," "Chicken," and "Bambino."
 
 
 7
 Under the ordering instructions, the brochure gave the following directions:
 
 
 8
 2. Place payment and order in one envelope marked "Travel Dept." Place that envelope inside another and mail to us.
 
 
 9
 3. Orders will not be shipped in the mail to avoid intrusion and for privacy. Common carrier shipment only.
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 6. All orders guaranteed. If your order is intercepted by customs authorities you will receive a letter. Send a copy to us for free replacement.
 
 
 13
 The government had obtained Porter's name from a mailing list belonging to Alpine Distributors, a company that dealt in the distribution of pornographic materials. Alpine was operated by Joseph Surin. Surin denies that he dealt in child pornography, although two weeks after Porter's trial he pled guilty to one count of knowing receipt of child pornography, 18 U.S.C. Sec. 2252(a)(2), and one count of lying to a federal investigative officer, 18 U.S.C. Sec. 1001. Charges of distributing child pornography were dropped.
 
 
 14
 Porter responded positively to the solicitation. He ordered a set of photos titled "Nymph Lovers," and indicated several alternate selections. He also sent a handwritten note, which stated:
 
 
 15
 Please accept this order and find check for $16.50 enclosed. I am very interested in any films or video tapes available for this subject matter. Please forward information with my order.
 
 
 16
 Special Agent John O'Malley arranged a package of twelve photographs, copied from a child pornography magazine, for shipment to Porter. The package was hand-delivered to Porter at his home by a Customs Agent, working undercover as a DHL courier. Porter accepted the package. Approximately ten minutes later, Customs agents conducted a pre-approved search of Porter's house. The photographs from the recently-delivered package were discovered on a table and on the floor in Porter's living room. The agents also found several adult pornographic videotapes.
 
 
 17
 Porter was tried and found guilty by a jury. Porter's counsel filed three post-trial motions: (1) a motion for acquittal pursuant to Fed.R.Crim.P. 27; (2) a motion for new trial; and (3) a motion for acquittal based on outrageous governmental conduct. Porter was permitted by the court to create a special record relating to his claim of outrageous governmental conduct, including a three-day hearing with six witnesses and twenty exhibits. All of Porter's motions were denied by the district court in a decision published at 709 F.Supp. 770 (E.D.Mich.1989).
 
 I. The brochure
 
 18
 Appellant admits that he collects and enjoys adult pornography. He claims to be well-acquainted with the terminology of the pornography business. Appellant maintains that he was never interested in receiving child pornography. Rather, because of his sophistication in the area, he knew that offers of the sort that arrived in the "Produit Outaouais" brochure often promise more than they deliver; i.e., they hint at illicit child pornography in order to trap the dirty-minded but unsophisticated consumer, but actually deliver at most only adult models posing as children. He also knew that responding to such offers often had the effect of adding one's name to various mailing lists. Appellant claims that he responded to the brochure out of curiosity, to see what kind of sham product he would receive and perhaps to be added to certain foreign mailing lists which might result in receiving other interesting mailings. In short, he claims that his motive in responding to the brochure was an outgrowth of his perfectly legal interest in adult pornography.
 
 
 19
 On appeal, appellant makes three arguments of error in connection with the "Produit Outaouais" brochure. First, appellant argues that the evidence presented by the government was insufficient to support his conviction of knowing receipt of child pornography; the government failed to prove the requisite mens rea for the crime. He argues that he neither intended not expected to receive child pornography from his response to the brochure. The brochure did not explicitly state the ages of the persons who would be presented in the photographs that it offered. Appellant argues that the wording of the brochure, while suggestive of child pornography, was also ambiguous enough to encompass legitimate adult pornography. The government responds that whatever ambiguity was created by the failure of the brochure to mention the ages of the models was dispelled by the explicit proviso that the subject matter of the photographs was under a "worldwide ban and intense enforcement" and by the references to "boys and girls" and "young boys."
 
 
 20
 Second, appellant argues that the government did not to present any independent evidence to establish appellant's predisposition to obtain child pornography. In the absence of establishing a predisposition, argues appellant, the government cannot overcome his claim of entrapment. Appellant cites United States v. Johnson, 855 F.2d 299 (6th Cir.1988). Johnson was a similar sting operation which led to a conviction under 18 U.S.C. Sec. 2252. The court stated that where a charge of entrapment has been made, "once the issue of predisposition is in dispute, the Government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense." 855 F.2d at 303. It found that there was sufficient evidence of predisposition to support Johnson's conviction.
 
 
 21
 Third, appellant claims that the government's use of the brochure, and the method of its procedures in general, were sufficiently outrageous to constitute a violation of due process. The Supreme Court has indicated that the conduct of law enforcement agents may be so outrageous that due process considerations would bar a conviction even though the defendant was not entrapped. United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637 (1973). The Sixth Circuit has identified four factors to determine whether police conduct infringes constitutional due process protection: (1) the need for the type of conduct in relationship to the criminal activity, (2) the preexistence of a criminal enterprise, (3) the level of direction or control of the criminal enterprise by the government, and (4) the impact of the government activity creating the commission of the criminal activity. United States v. Robinson, 763 F.2d 778, 785 (6th Cir.1985). The trial court carefully applied these factors to the government's conduct in this case and concluded that there was no infringement of appellant's constitutional rights.
 
 
 22
 The standard of review for overturning a conviction is that the court must reverse only if, based on the evidence, "a reasonable mind could not find guilt beyond a reasonable doubt." Johnson, 855 F.2d at 303, citing United States v. Stull, 743 F.2d 439, 442 (6th Cir.1984), cert. denied, 105 S.Ct. 1779 (1985).
 
 
 23
 The government's evidence of predisposition consisted of: (1) the presence of appellant's name on a mailing list belonging to Alpine Distributors, which the government characterized as a purveyor of child pornography, and (2) the enthusiasm of appellant's response to the brochure offer.
 
 
 24
 We hold that the wording of the brochure sent to Mr. Porter and the enthusiasm of his response provided sufficient evidence of predisposition and of mens rea to overcome a claim of entrapment and to support a jury verdict convicting appellant of knowing receipt of child pornography. Ideally, perhaps, the Customs Service's brochure would have included the actual ages of the models in the materials it offered. (The brochure was modelled on various European child pornography mailings, some of which apparently included the ages of the models.) The absence of any mention of the actual ages means that a jury could find that a defendant who responded to the offer had not actually intended to order child pornography. In the present case, however, Porter presented the jury with just such an argument and the jury did not believe it. In refusing to credit Porter's account of his intentions, the jury acted within its proper function as the resolver of issues of credibility. Furthermore, we agree with the district court's analysis of the government's conduct and find no constitutional infringement resulting from its behavior.
 
 II. The Alpine connection
 
 25
 Appellant objects to the admission of evidence as to his connection with Alpine Distributors. He also objects to remarks made by the prosecution at trial. At trial, the prosecution called Agent O'Malley, who testified that Porter's name was found on a mailing list of Alpine Distributors. The prosecution referred to Alpine as a child pornography distribution company. Appellant claims that he has no idea how Alpine got his name on its mailing list. He claims never to have had any dealings with Alpine. In view of these facts, he argues that the prosecution's remarks at trial, tying him to alleged child pornographers, had an illegitimately prejudicial effect.
 
 
 26
 We hold that the evidence that appellant's name appeared on Alpine's mailing list was properly admitted at trial. The mailing list evidence was not introduced for the purpose of establishing appellant's guilt, but rather to rebut the claim of entrapment. Once appellant raised the defense of entrapment, the government was obligated to present evidence of predisposition and of the narrow focus of its operation. The presence of appellant's name on Alpine's mailing list was properly introduced for those purposes. Appellant complains that the government had not established that Alpine was in fact a distributor of child pornography. However, given the limited purpose for which the mailing list evidence was introduced, it was not necessary for the government to prove that Alpine was in fact involved in distributing child pornography; it was sufficient that the government had a reasonable suspicion that Alpine was involved in that business. As we discussed in the next section in another context, the government had a reasonable suspicion that Alpine was involved in distributing child pornography.
 
 
 27
 Appellant also objects to allegedly prejudicial statements made by the prosecution. In his argument, the prosecutor stated that when the knock came at the door, appellant "was looking at these [photographs], examining them and perhaps fantasizing about them," and that he "was enjoying himself." Appellant claims that these statements were not supported by evidence. He also contends that the remarks were meant to imply to the jury that appellant was viewing the photographs while masturbating. The government responds that it was rebutting the defense that appellant thought he would receive adult pornography by making the point that appellant had not thrown away the photographs immediately upon realizing their true nature. We hold that the district court's refusal to sustain an objection to the prosecutor's remarks did not constitute reversible error.
 
 
 28
 In his argument, the prosecutor also stated that:
 
 
 29
 What this evidence is, I suppose, is an interest in Mr. Porter in young girls.... it is almost as if he's saying that he has a desire to sleep with somebody's teenage daughter.
 
 
 30
 The defense objected at that point and the court responded: "Let's move on to something else." Appellant argues that the statement was prejudicial and the judge's corrective was insufficient. We hold that the district court's conduct in dealing with the objection did not constitute error.
 
 III. Refusal to grant continuance
 
 31
 At the post-trial hearing allowing appellant to create a "special record" concerning his claim of outrageous governmental conduct, appellant requested a continuance of approximately one month in order to obtain the testimony of Joseph Surin, operator of Alpine Distributors. The reason for the delay was to await the date of Surin's sentencing after his plea of guilty to charges of receipt of child pornography. Before ruling on the continuance, the district court inquired into the substance of Surin's proposed testimony. Appellant stated that Surin would testify that Alpine had not distributed child pornography. The district court also reviewed a videotape that Agent O'Malley had obtained from Surin and found that the movie, though ambiguous, could be viewed by a reasonable person as containing child pornography. Thus, the court found that the Customs agents had a reasonable suspicion that Surin was involved in distributing child pornography and their selection of names from Surin's mailing list did not constitute outrageous governmental conduct. On that basis, the court denied appellant the continuance.
 
 
 32
 Appellant now argues that it was error to deny him the continuance. Surin has since executed an affidavit in which he denies that he distributed child pornography. According to appellant, Surin's testimony would undermine an essential part of the government's case--that Surin was a known child pornographer--by showing that the government was "guilty of manufacturing the entire connection of 'Alpine Distributors' with child pornography."
 
 
 33
 The district court's denial of a continuance was not an abuse of discretion; the post-trial hearing was for the specific purpose of obtaining evidence relating to the government's allegedly outrageous behavior. The only question relevant to outrageous conduct in the post-trial hearing was whether the Customs agents acted without reasonable suspicion in targeting names from Surin's mailing list. Had he testified, Surin's testimony would have been probative only of whether he was in fact involved in distributing child pornography. However, once it was established by means of the videotape that Customs agents had a reasonable suspicion that Surin was distributing child pornography, the question of Surin's actual involvement was irrelevant to the issue of outrageous governmental behavior. Because Surin's testimony would not have changed the analysis of outrageous governmental conduct, there was no error in the district court's denial of the continuance.
 
 
 34
 Appellant also argues that the court erred in refusing to certify one of his witnesses as an expert on the subject of child pornography and government programs to eradicate it. The witness, Larry Stanley, a lawyer and writer who had written articles on government actions against pornography, was allowed to testify, but not as an expert. We hold that the district court acted within its discretion in refusing to certify Stanley as an expert.
 
 
 35
 For the foregoing reasons, Allen Porter's conviction is AFFIRMED.
 
 
 
 *
 The Honorable Frank J. Battisti, United States District Judge for the Northern District of Ohio, sitting by designation
 
 
 [1]
 "Operation Borderline" involved a sham pornography company, "Produit Outaouais," located in Hull, Ontario. The company used brochures that closely resembled the brochures of child pornographers who had been investigated by the Customs Service