**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Bobby Joe NORTON (82–5032), Gladys Girgenti (82–5033), Defendants-Appellants.**

**Nos. 82–5032, 82–5033.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 10, 1983.

Decided Feb. 25, 1983.

Certiorari Denied April 25, 1983. See 103 S.Ct. 1885.

James W. Price, Jr. (argued), Pack, Neil & Price, Nashville, Tenn., for defendants-appellants in No. 82–5032.

Michael Noel (argued), William H. Farmer, Federal Public Defender, Nashville, Tenn., for defendants-appellants in No. 82–5033.

Joe B. Brown, Jr., U.S. Atty., Nashville, Tenn., Robert Washko (argued), Margaret M. Huff, Asst. U.S. Attys., for plaintiff-appellee.

Before MERRITT and JONES, Circuit Judges, and JOINER,* District Judge.

MERRITT, Circuit Judge.

Appellants appeal their convictions in a jury trial arising out of an attempt to bomb a Jewish synagogue in Nashville, Tennessee. Gladys Girgenti was found guilty by the jury on the following four counts: interstate transportation of stolen explosives, interstate transportation of explosives with intent to destroy a building, attempting to destroy real property used in interstate commerce by means of an explosive material, and conspiracy to violate the above three statutes. She was sentenced to three concurrent ten-year prison terms and an additional five-year consecutive term for the conspiracy. Bobby Joe Norton was also found guilty on the same four counts and was sentenced by Judge Wiseman to four five-year concurrent prison terms. Both appellants challenge their convictions on numerous grounds.

Appellant Girgenti has been an active member of the Ku Klux Klan (KKK) in Nashville for many years. The evidence at trial clearly shows that in May, 1981 she and others planned a series of commando strikes aimed at Jewish-owned businesses and organizations. The primary target, which became the subject of the convictions below, was one of the three Jewish synagogues in Nashville. The group consisted of the two appellants, an undercover Alcohol, Tobacco and Firearms (ATF) agent, two American Nazi Party members, one of whom pled guilty and testified for the government, and possibly several other KKK sympathizers.

The undercover agent, Bob Vance, infiltrated the KKK and participated in the planning and execution of the bombing operation. Vance arranged for the substitution of a fake bomb and notified the ATF of the operation so that the government could apprehend the appellants as they arrived at the synagogue. In addition, the agent used recording devices to make tapes of numerous conversations among the various conspirators during the planning stages.

Appellants charge the lower court with the following errors: (1) the judge improperly refused to recuse himself; (2) the jury should have been sequestered throughout the trial and a mistrial granted after a threatening telephone call to a juror; (3) the conduct of the informant, Vance, amounted either to a violation of the appellants' rights to due process or entrapment; (4) the impossibility of the alleged illegal conduct; and (5) a "fatal variance" between the conspiracy charged in the indictment and the conspiracy proven at trial. In addition, appellant Girgenti maintains that Judge Wiseman did not instruct the jury

---

* The Honorable Charles W. Joiner, United States District Judge for the Eastern District of Michigan, sitting by designation.

properly as to her entrapment theory and that the government failed to prove that she had the requisite knowledge that the explosives were stolen.

## I. ENTRAPMENT

Appellants both argue that the convictions should be overturned because of the actions of the undercover agent in furthering the operation. They claim that Vance supplied the necessary technical knowledge, that he persistently encouraged the group to proceed with the plan and that "such actions taken in their totality amount to legal entrapment." (Girgenti Brief, p. 26) The appellants admit that several of the conspirators talked of using explosives to destroy Jewish property prior to the involvement of Vance, but they maintain that it was Vance who turned such discussions into a plan or conspiracy. Thus, they conclude that "it was in fact his [Vance's] actions that cause [sic] the commission of the offenses." (Girgenti Brief, p. 27.) Absent a finding of entrapment, Girgenti and Norton call upon the Court to use its discretion to throw out their convictions under the Court's "inherent supervisory powers" because the conduct of the government agent was "so outrageous and pervasive." (Girgenti Brief, p. 26.)

[1] The Supreme Court and the Sixth Circuit have consistently held that entrapment may be a defense only where the defendant did not have a predisposition to commit the crime. *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); *United States v. Russell,* 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1972) ("It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.") *United States v. Leja,* 563 F.2d 244 (6th Cir.1977). In the case at hand, there was sufficient evidence for the jury to find that the appellants had begun planning the bombings before Vance joined the conspiracy. (Tr. 1274) Vance did not initiate the scheme to destroy Jewish property; at most he facilitated the plan and encouraged the conspirators to continue toward the goal that they had enunciated to him at his first meeting with the group. Thus, a rational jury could plausibly find that appellants had a predisposition to commit the crimes involved.

Appellants also ask the Court to overturn their convictions because of the conduct of the ATF agent, who they believe used impermissible police tactics. They rely on the view of five justices in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), indicating that some police conduct might be so egregious as to violate the due process rights of the accused or to warrant the dismissal of the suit under the powers of the courts to supervise the entire law enforcement process. The Sixth Circuit has been reluctant to utilize such powers, given that to do so would greatly intrude into the law enforcement functions of the executive branches of federal and state governments. *See, e.g., United States v. Leja, supra* (6th Cir.1977); *United States v. Brown,* 635 F.2d 1207 (6th Cir.1980); *United States v. Bowling,* 666 F.2d 1052 (6th Cir.1981).

The criteria to consider when establishing outrageous police involvement have been outlined by the Sixth Circuit in *Brown, supra:* (1) the need for the conduct as shown by the type of criminal activity involved; (2) whether the criminal enterprise preexisted the police involvement; (3) whether the government agent directs or controls the enterprise; and (4) the impact of the police activity on the commission of the crime. In this case, the government perceived a serious—and not clearly unwarranted—threat to the community because of the violent history of the Ku Klux Klan. The government saw a need to use infiltration tactics including the active participation of the infiltrator because of the secret nature of the organization and the suspicions the members had of outsiders and observers. As discussed above, the agent did not instigate the scheme; rather, he joined a group that had already begun planning the criminal activity. Although the parties dispute the level of control exerted

by Bob Vance, there was sufficient evidence in the record to show that the appellant, Girgenti, controlled the overall execution of the operation. Finally, appellants attempt to show that Vance's participation in obtaining the explosive material and in creating what the conspirators later discovered to be a false bomb amounts to the serious impact on the crime which the *Brown* case lists as the fourth criterion. However, the Supreme Court in *Hampton, supra,* upheld Hampton's conviction on a drug distribution offense even though one government agent supplied the controlled substances to the defendant and another agent purchased the illegal drugs. Simply converting the dynamite into a fake bomb—especially since it is not at all clear from the record that the conspirators would not have been able to manufacture the bomb without the agent—is similar to supplying the illegal drugs which the Supreme Court has clearly accepted as legitimate police tactics.

Thus, the appellants fail to make a persuasive argument under any of the four *Brown* criteria for the extraordinary use of court powers to overturn their convictions in order to curb outrageous police conduct.

## II. THE JUDGE AND JURY

Both appellants request a new trial because of the alleged partiality of Judge Wiseman and of several of the jurors. They point to statements made by Judge Wiseman during and immediately following the voir dire of prospective jurors. At one point he expressed his general feelings of abhorrence toward the actions of the German Nazi Party during the Second World War. He also stated as follows:

> ... they [the jurors] may have a preconceived idea that the Klan or the American Nazi Party are racist organizations. I think you would have to find a jury of blithering idiots, that never lived in this country and never read a newspaper or anything else, who didn't have that impression."

(Tr. p. 147.)

■ Under 28 U.S.C. § 455(a), a federal judge is required to recuse himself "in any proceeding in which his impartiality might reasonably be questioned." The standard to be applied under § 455(a) is an objective one: whether the reasonable person, knowing all of the surrounding circumstances, would consider the judge to be impartial. *See Roberts v. Bailar,* 625 F.2d 125 (6th Cir.1980). None of the remarks challenged by appellants were directed at the parties; rather, Judge Wiseman simply made general statements which reflect prevailing societal attitudes. In addition, the Judge was careful to caution each juror that the American Nazi Party and the KKK were not on trial and that the defendants were not being tried for their affiliations with these groups. Taken as a whole, these statements do not evidence the prejudicial attitudes which would require a judge to recuse himself. In other words, we do not believe that a reasonable person would construe these remarks as indicating that Judge Wiseman lacked impartiality on the question of whether these particular defendants committed the specific crimes with which they were charged.

■ The appellants also argue that the Judge should have granted them a mistrial because of the alleged bias of the jury. They petitioned to have the jury sequestered and then charged error when one member of the jury received a telephone call and related the message to others on the jury. The caller (whom the juror believed to be black) told the juror: "Just be sure you make the right choice." (Tr. 1761–63.) Judge Wiseman carefully questioned all of the exposed jurors as to the effect of the phone call on their ability to remain impartial. All of them responded that they were not intimidated, having viewed the call as a harmless prank. Given the Judge's precautionary measures, we do not believe that his failure to sequester the jury constitutes reversible error. Nor does it appear that the outside contact appreciably swayed the members of the jury so as to call seriously into question their impartiality.

## III. IMPOSSIBILITY AND VARIANCE

■ Petitioners also object to their convictions on the grounds that they were pros-

ecuted for transporting stolen explosives through interstate commerce when, in actuality, the government transported the explosives. Norton and Girgenti view their convictions for illegal transportation of explosives as a "legal impossibility" given that the government carried the goods legally across the state lines.

Appellants fail to take into account 18 U.S.C. § 2(b) in their impossibility argument. Section 2(b) reads as follows:

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The evidence introduced at trial sufficiently shows the involvement of the defendants in procuring the explosives and in causing the dynamite to be carried across state lines, albeit in the government agent's truck. Under § 2(b) the appellants are to be treated as principals in the crimes of illegally transporting stolen explosives and transporting explosives for the purpose of destroying a building even though they themselves may not have physically carried the materials from Alabama to Tennessee.

In a similar argument, appellants maintain that there was a "fatal variance" between the indictment, which outlined a conspiracy to bomb the Temple, and the proof at trial showing an attempt to bomb the Synagogue. Testimony at trial by agent Vance indicates that the conspirators were ambivalent as to which Jewish place of worship would be the best target. The group initially planned to destroy the Temple but at the last minute Vance, who was driving the truck, turned toward the Synagogue to facilitate the arrests by the government. The conspirators did not object to the last minute minor change in plans.

Appellants seem to be arguing that where any mistake in factual detail occurs in the indictment, the court must overturn their convictions. In *United States v. Beeler,* 587 F.2d 340 (6th Cir.1978), the Sixth Circuit defined a variance as "when the proof introduced at trial *differs materially* from the facts alleged in the indictment. . . . Variances may be subject to the harmless error rule." *Id.* at 342. In *Beeler,* the Court reversed the defendant's conviction for extortion under the Hobbs Act because the indictment failed to mention a crucial agreement to accept payments in exchange for a promise to vote a particular way on an issue before the Board of Commissioners of Knox County, Tennessee. The indictment also did not mention a $30,000 payment to the defendant. The government did, however, introduce evidence of these facts and events at trial.

■ Obviously, the variance between the indictment and the proof introduced at trial in *Beeler* is much more extensive than the variance in this case. The counts involving transportation of stolen explosives and conspiracy to so transport explosives are in no way affected by the variance in facts. Even those counts which describe the Temple as the target do not differ *materially* from the crime proven at trial: the appellants were shown to have conspired and to have attempted to destroy a Jewish place of worship in Nashville using stolen explosives transported across state lines. Even if the incorrect label attached to the particular target in this situation is deemed to be a material difference, appellants do not show any prejudice to their defense arising from this alleged variance. Thus, the difference between the facts stated in the indictment and those proven by the government at trial fails to pass the test for reversible error as laid out in *Beeler, supra.*

### IV. KNOWLEDGE OF STOLEN QUALITY

■ Finally, appellant Girgenti argues that there was insufficient evidence for the jury to find that she had knowledge that the explosives had been stolen. Under 18 U.S.C. § 842(h) the government must prove that she transported explosive materials "knowing or having reasonable cause to believe that such explosive materials were stolen."

Although there is not a great deal of proof in the record establishing this critical element of knowledge, we believe that the testimony of Vance provided the jury with enough evidence that they could find beyond a reasonable doubt that Mrs. Girgenti knew or had reason to believe that Norton was obtaining stolen explosives. At the trial, Vance testified that he, Girgenti and Norton went to Norton's house in Murfreesboro, Tennessee, where Norton made a telephone call to Mr. Garrett, the supplier of the dynamite. Vance further testified as follows:

A. Well, he called a gentleman by the name of Garrett and asked him if he had some powder. The man told him yes. He made arrangements for us to meet him and get the powder from him.

Q. Did Mr. Norton relate to you and Mrs. Girgenti the source of that dynamite?

A. He was talking to a Marcus Garrett on the phone. I don't know if Garrett was supposed to bring it to him or he was going to meet him somewhere and pick it up or what at that time.

Q. Did Mr. Norton indicate how Mr. Garrett got it?

A. Yes. He said he got it from where he worked. He worked with explosives, and he pocketed a little on the jobs he had.

(Tr. 1835.)

We believe that the jury justifiably found that Norton and Garrett meant by the slang term "pocketed" that the explosives were stolen from Garrett's workplace and that they conveyed this information to Girgenti as well as to Vance.

For these reasons, we affirm the convictions of appellants on all counts.