**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Hubert PAYNE (91–3417/3624), Val C. King (91–3588), Defendants–Appellants.**

**Nos. 91–3417, 91–3588, 91–3624.**

United States Court of Appeals, Sixth Circuit.

Argued April 10, 1992.

Decided May 5, 1992.

Rehearing and Rehearing En Banc Denied June 22, 1992.

Ronald B. Bakeman, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Cleveland, Ohio, for U.S.

James R. Willis (argued and briefed), Cleveland, Ohio, for Payne.

Jerome Emoff (argued and briefed), Cleveland, Ohio, for King.

Before: NORRIS and SUHRHEINRICH, Circuit Judges; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Defendant-appellant, Val. C. King, appeals his conviction and sentence for violation of 18 U.S.C. § 371 for conspiracy to defraud the United States by laundering money and of 18 U.S.C. § 1956 for money laundering. Defendant-appellant, Hubert Payne, appeals his conviction and sentence for violation of 18 U.S.C. § 371 for conspiracy to defraud the United States by laundering money. For the following reasons, we affirm.

## I.

In spring 1988, the IRS received information from an FBI informant that Frank Coyle, a Cleveland stockbroker, and John McCurley, a drug dealer, were involved in money laundering. The IRS decided to initiate an undercover sting operation into the money laundering activities of Frank Coyle.

An IRS undercover agent, Monaghan, contacted Coyle and met him on July 12, 1988. During a recorded conversation, Coyle identified defendant King as a friend who "could legitimize any kind of money" for a fee of 25%. When the undercover agent objected to the high fee, Coyle called defendant King and discussed lowering the fee. Later that same day, Coyle again met with the undercover officer and informed him in a recorded conversation that defendant King was willing to launder his money for a 15% fee.

Coyle told the undercover officer that defendant King's plan to launder his drug money called for the officer to give the cash to two attorneys, Ralph Jones and Ferris Williams, who would convert the cash to checks. Pursuant to the plan, the undercover officer met with the attorneys on September 21, 1988, and gave the attor-

neys $50,000 cash for the purpose of laundering. The attorneys, however, had problems with laundering the cash, and it took them approximately six months and several bounced checks to accomplish the laundering of the cash previously received on September 21, 1988.

During the course of the delays and bounced checks, Coyle testified that defendant King discussed the problems and Coyle told King that he ought to find someone else. Sometime shortly before March 20, 1989, Coyle testified that defendant King called him and informed him that defendant Payne was willing to launder the undercover officer's cash. On March 20, 1989, Coyle called the undercover officer and informed him that defendant King had found another person to launder his cash and a meeting between defendant King and the undercover agent was arranged for March 23, 1989.

On March 23, 1989, the undercover officer met Coyle and, for the first time, met defendant King. The meeting was recorded. The undercover officer made it absolutely clear, at the very beginning of the meeting, that his money came from the sale of cocaine. During the conversation with the undercover officer, defendant King indicated that he had arranged the original deal with the attorneys and described the attorneys' efforts to launder Monaghan's cash as a "disaster" and "embarrassing." Defendant King told Monaghan that a friend of his, defendant Payne, had agreed to launder the officer's cash for a 20% fee and that it would take defendant Payne only 10 to 14 days. Defendant King assured Monaghan that the previous problems of bounced checks with the attorneys would not reoccur.

On March 31, 1989, undercover officer Monaghan met defendant Payne along with defendants King and Coyle. The meeting was recorded and played for the jury during the trial. Again, the undercover officer made it absolutely clear that his money came from the sale of cocaine. Defendant Payne informed the officer that defendant King had informed him of the prior problems and that he, Payne, assured the officer that the officer would have no problems with him and even stated that he would give the officer certified checks if the officer wanted them. Defendant Payne told the officer that he had several ways to launder the cash, but the best way was through a business that could be set up to accept large sums of cash. Defendant Payne stated that although he controlled the business, the business could not be traced to him. Defendant Payne further stated that the laundered cash would be returned to the officer in the form of a check and that the check would not be signed by Payne and could not be traced to him. Defendant Payne gave the officer his business card with his and defendant King's home telephone numbers in order that the officer could contact them when he was ready to launder his cash.

On April 12, 1989, defendant King met with the undercover officer at a local hotel room and received $25,000 in cash to be laundered. Defendant King telephoned defendant Payne from the hotel room and after King left the meeting with the officer, defendant King drove immediately to the residence of defendant Payne.

On April 18, 1989, Coyle testified that defendant Payne gave him a $25,000 check made payable to the undercover officer's fictitious account, the Putnam Investment account. The check was drawn on a company called Investors Unlimited. Leonard Trem had opened the Investors Unlimited account on April 11, 1989, less than two weeks after defendants King and Payne had met with the undercover officer. The money deposited into the account was the result of a series of bank checks, all less than $10,000. The bank checks, all from different banks located within a short distance of each other, were purchased with cash.

On July 24, 1990, defendants-appellants Val King and Hubert Payne along with co-defendants Frank Coyle, Ralph Jones, Leonard Trem,[1] and Ferris Williams were indicted by a federal grand jury on a six-

---

1. Leonard Trem was tried and acquitted.

count indictment. Coyle, Williams and Jones pled guilty. During the trial of defendants Payne and King, those who had pled guilty, Coyle, Williams, and Jones, testified against defendants Payne and King on the government's behalf. At the trial, defendant King did not testify and did not present any evidence.

Defendant Payne testified that defendant King brought him into the money laundering enterprise. Defendant Payne conceded that he met with the undercover officer on March 31, 1989, that he knew that the undercover officer made his money from the sale of cocaine, and that he discussed with the officer ways in which he could launder the officer's money. He contended, however, that he never meant to launder drug money. Defendant Payne testified that he withdrew from the conspiracy following the March 31, 1989 meeting. Defendant Payne, on cross-examination regarding the issue of withdrawal, admitted that he never contacted any law enforcement agency about the money laundering activities of Coyle, King, or the undercover officer and that all he told King was that the laundering of the undercover officer's money was crazy and not in their best interest. Defendant Payne did nothing to stop the money laundering activity.

Based on the foregoing evidence, on March 9, 1991, defendant King was found guilty of conspiracy to launder money and the substantive offense of money laundering and defendant Payne was found guilty of conspiracy to launder money. Payne was acquitted of the substantive offense of money laundering.

On June 21, 1991, King was sentenced to 50 months in prison and a $25,000 fine. Payne received a sentence of 46 months and a $25,000 fine.

Defendants timely filed an appeal.

## II.

We must first decide whether the government's investigation and undercover operation in regard to defendant King shocks a universal sense of justice and fundamental sense of fairness.

Defendant King argues that the government's sting operation was based on outrageous government conduct. This defense was first articulated in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), which states that if the government conduct in an undercover operation is so outrageous that it shocks the conscience, the government would be barred from obtaining a conviction. *Id.* at 431–32, 93 S.Ct. at 1642–43. However, this defense does not preclude the government from conducting undercover operations. As the Supreme Court stated in *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976), this defense only applies if the government activity in question violates some protected right of the defendant. In *United States v. Brown*, 635 F.2d 1207, 1212–14 (6th Cir. 1980), this court articulated four factors to consider regarding claims of outrageous government conduct. The first factor to consider is the need for the government conduct. Defendant King contends that there is no need for undercover investigations of money laundering in which undercover agents pose as drug dealers who are trying to launder money, because there is a less intrusive means of investigating such activity. Defendant King argues that the government should instead monitor all financial currency transactions. This argument is ridiculous. The government has no such authority.

The second factor to consider is whether the criminal enterprise preexisted the undercover investigation. Defendant King argues that the government only had suspicions of defendant Coyle, the stockbroker, who had been implicated by the FBI informant. Defendant King argues that before the undercover sting operation, the government had no suspicions that he was involved in money laundering. This argument is to no avail. Before the undercover officer ever met defendant King and discussed money laundering with him, the government had a "reasonable suspicion" that he was involved in money laundering because the undercover agent had witnessed a telephone call in which Coyle

called defendant King and defendant King agreed to launder money for a certain fee. Just because King was unknown when the undercover operation commenced does not mean that his constitutional due process rights were violated or that the government's conduct in his regard was outrageous. Once an undercover operation has begun, new conspirators, who are at first unknown to the government, may be uncovered during the course of the investigation.[2]

The third factor to consider is whether the government agent directed or controlled the enterprise. Defendant King claims that the government was excessively involved in the money laundering activity because one of its agents played the role of a drug dealer who had money and put pressure on other people to launder the money.

We do not agree that this involves excessive government activity. The role playing and provision of money in the present case merely gave the defendants the opportunity to commit the crime of money laundering. The defendants, on the other hand, supplied the fictitious account in which to deposit the laundered money and accepted the cash and converted it into checks without the filing of a currency transaction report, set up a fictitious business called Investors Unlimited, and then issued checks back to the fictitious account previously set up to accept the laundered cash. In undercover drug deals it is not considered excessive for the government to supply the funds to purchase the drugs or to provide the drugs themselves to be purchased by the defendant. *See Hampton v. United States,* 425 U.S. at 489–90, 96 S.Ct. at 1649–50. Similarly, in the present case we do not believe it was excessive merely to provide money to be laundered. It was the defendants who devised the manner in which the cash was to be structured to avoid detection.

The fourth factor to be considered is the impact of the law enforcement activity on the commission of the crime. Defendant King argues that the government's impact was too great because it continually put pressure on defendant Coyle to find other sources for money laundering. This argument is to no avail for two reasons. First, the Supreme Court has stated that the government's conduct must violate the defendant's rights, not a third-party's right. *Id.* at 490, 96 S.Ct. at 1650. There is no evidence that the government coerced King. Second, defendant Coyle denied that any pressure was placed on him by the undercover officer to get other people involved in the money laundering. Moreover, the facts indicate that upon the first meeting between the undercover agent and Coyle, Coyle called King, who immediately agreed to launder the money for a fee.

Finally, defendant King's argument that the defense of outrageous government conduct is to be determined by the jury is contrary to what has been stated by the Fifth Circuit. In *United States v. Stanley,* 765 F.2d 1224, 1232 (5th Cir.1985), the court stated that the defense of outrageous government conduct is an issue to be determined by the court and not a jury. Also, defendant King's argument that 18 U.S.C. § 1956(a)(3) is unconstitutional because it has a provision for sting operations is without merit. No court has ever stated that, as a matter of law, it is impermissible for the government to engage in "undercover" or "sting" operations. Instead, each operation must be examined based on the facts of each situation. In the present case, the facts, which consist of role playing and providing money, do not indicate that the government's conduct was outrageous.

2. This case is distinguishable from *Jacobson v. United States,* ⸺ U.S. ⸺, 112 S.Ct. 1535, 118 L.Ed.2d 147 (1992) recently decided by the Supreme Court. Unlike *Jacobson,* the government in the present case did not make the initial contact with defendant King or put pressure on King to join the money laundering conspiracy. Defendant King was not the subject of the sting operation, but became a willing participant after only one telephone call from defendant Coyle, providing evidence that King had engaged in prior conversations with Coyle about money laundering. In contrast, the defendant in *Jacobson,* who was the subject of the sting operation, was entrapped by the government after extensive inducements to engage in illegal activity without sufficient evidence that Jacobson was predisposed to violate the law.

Therefore, the district court is affirmed on this issue.

### III.

We must next decide whether the government violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) by excluding two black jurors who were active in civil rights causes.

Defendant King argues that the government peremptorily challenged two jurors because of their race and excluded them from the jury on the basis of race, violating *Batson v. Kentucky*.

■ The government argues that the reason it used two of its peremptory challenges in order to exclude two black individuals, who were associated with black activist groups, NAACP and Black Caucus, was because defendant King was trying to inject the issue of race discrimination into his trial. Defendant King had sought to introduce evidence of a civil race discrimination suit which he had filed against a former employer. The trial court reserved ruling on this motion until such time as the defendant sought to introduce this evidence. It was against this background that the prosecution sought to exclude the two jurors. The government argues that it was not because of their race but because of the advocacy groups to which they belonged that these two individuals were excluded.

This court reviews a district court's findings about the credibility of the prosecutor's asserted neutral explanations for peremptory challenges under a clearly erroneous standard. *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir.1990). We do not find that the distinction the government drew between the race of the two individuals who were excused and the affiliations and activities of those two individuals to be clearly erroneous. Moreover, all black jurors were not excluded from the jury. In these circumstances, we do not believe that the prosecutor's explanation can be regarded as pretextual. Therefore, we affirm the district court's finding that the prosecutor offered a valid neutral explanation for the exclusions.

### IV.

Both defendants King and Payne argue that hearsay evidence was admitted in violation of Fed.Rule Evid.Rule 801(d)(2)(E), because it had not been shown by a preponderance of the evidence that a conspiracy existed, or that the defendant against whom the hearsay was offered was a member of the conspiracy.

Specifically, defendant King argues that there is insufficient evidence to indicate that he was a member of the first money laundering conspiracy which involved the laundering of the money through the attorneys Ralph Jones and Ferris Williams. Defendant King argues that the statements of Jones and Williams should not have been admitted against him because there is insufficient evidence to link him to those two people or the first money laundering transaction that occurred.

■ We disagree that there is insufficient evidence to link King to Jones and Williams or to indicate that they were all members of the same conspiracy. First, Coyle testified that defendant King gave him Jones' and Williams' telephone numbers and stated that they were willing to "convert cash into checks for a fee." Second, there was a recorded telephone conversation of defendant King in which he apologizes for the disastrous and unprofessional conduct of Jones and Williams. Third, there is a recorded telephone conversation of defendant King, reaffirming King's knowledge of the problems incurred with Jones' and Williams' bounced checks. For all of these reasons, the district court properly admitted the statements of co-conspirators Jones and Williams against defendant King. It was established by a preponderance of the evidence that a conspiracy to launder money through attorneys Jones and Williams existed and that defendant King, against whom the hearsay testimony of Jones and Williams was offered, was a member of the conspiracy.

In regard to defendant Payne, he first argues that the statements which co-conspirator King made prior to March 20 and

March 23, 1989 were statements made before he entered into the conspiracy and were improperly admitted as co-conspirator statements against him.

■ We disagree. Defendant Payne's membership in the conspiracy is evident from Payne's own admissions made on March 31, 1989. In other words, the statements of defendant King, which Payne is contesting should not have been admitted into evidence, merely affirm what Payne himself later admitted on March 31, 1989. Although it is true that Payne did not meet and speak with the undercover agent until March 31, 1989, King's statements about Payne's prior activities were confirmed by the conversation which Payne had with the undercover agent on March 31, 1989. In this conversation, Payne indicated that King had told him about the problems the officer had had with the two attorneys during the previous money laundering transaction and Payne assured him that he would not have such problems with him. Thus, it is not just the hearsay testimony of defendant King that links Payne to the conspiracy, but his own overt act. Defendant Payne's own statements establish, by a preponderance of the evidence, that he was a member of the conspiracy and that King's statements were in furtherance of the conspiracy. Therefore, they were properly admitted under Fed.Rule Evid.Rule 801(d)(2)(E).

The second argument defendant Payne makes in regard to co-conspirator statements is that there is no evidence that he was a member of the first transaction of the money laundering conspiracy which consisted of the money the undercover agent gave to attorneys Jones and Williams on September 21, 1988, which they then converted into cash.

■ Even if it is conceded that Payne was not a member of the conspiracy involving the $50,000 cash given to attorneys Jones and Williams, the admission of the testimony of Jones and Williams was not prejudicial to Payne. The trial court, at defendant Payne's request, fully instructed the jury as to the law of multiple conspiracies. Specifically, the trial court instructed

the jury that if they found Payne was not a member of the conspiracy involving the first transaction with Jones and Williams, then the jury was not to consider the evidence regarding the actions of Coyle, Jones, and Williams in this regard in deciding the guilt of defendant Payne. Moreover, the Supreme Court has recently held that the insufficiency of the evidence as to one of multiple objectives of a conspiracy charged in a single count does not require setting aside a general verdict of guilty on the charge. *Griffin v. United States*, ——— U.S. ———, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). Therefore, even if there were insufficient evidence to tie Payne to the laundering of the $50,000 provided on September 21, 1988, there was sufficient evidence to tie him to the laundering of the $25,000 provided on April 12, 1989.

### V.

■ Defendant Payne also argues that the trial court improperly placed the burden of proof regarding Payne's alleged withdrawal from the conspiracy on him and that the burden of proof should have been placed on the government. Defendant Payne essentially is asking this court to reverse the precedent of this circuit in regard to this issue. This court places the burden of proof for withdrawal from a conspiracy on the defendant as stated in *United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir.), *cert. denied*, ——— U.S. ———, 112 S.Ct. 397, 116 L.Ed.2d 347 (1991). We see no reason for requesting an en banc panel of this court to reconsider this opinion, as defendant wishes, because it is consistent with the opinions of other circuits. *See*, *e.g.*, *United States v. Cardall*, 885 F.2d 656, 668 n. 22 (10th Cir.1989); *United States v. Walker*, 796 F.2d 43, 49 (4th Cir.1986); *United States v. Boyd*, 610 F.2d 521, 528 (8th Cir.1979), *cert. denied*, 444 U.S. 1089, 100 S.Ct. 1052, 62 L.Ed.2d 777 (1980). Moreover, the Sixth Circuit's position of placing the burden of proof for affirmative defenses on the defendant is consistent with the Supreme Court decision in *Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987). For these

reasons, the district court is affirmed on this issue.

## VI.

Both defendants challenge their convictions based on insufficiency of the evidence. In essence, both defendants are arguing that more credence should be placed on their testimony than the testimony of defendant Coyle, who was cooperating with the government and who was motivated to help try to convict them. Defendant King argues that it is only Coyle's testimony that connects him to the money that was laundered in the second transaction. Defendant Payne argues that it is only defendant Coyle's testimony that indicates that he set up the second transaction. What both defendants fail to realize is that under the standard for the sufficiency of the evidence, the appellate court is to construe all facts in favor of the government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ It is clear that under this standard, there is sufficient evidence to convict each defendant. Even though defendant Coyle was testifying for the government, the jury had the right to credit his testimony over that of the defenses asserted by defendants King and Payne. In other words, the jury evidently believed defendant Coyle rather than defendant King, whose attorney argued that there was no evidence that King did anything with the $25,000 that the undercover agent had given to him on April 12, 1989,[3] or was involved with the $50,000 given to the two attorneys. The jury also credited the testimony of defendant Coyle over that of defendant Payne that Payne did not withdraw from the conspiracy as he alleged. Under the standard of construing all the evidence in favor of the government, these facts as provided by Coyle must be

taken as true as the jury accorded them credibility. In regard to defendant Payne, acquittal of the substantive offense does not constitute a determination that no overt act was committed, nor preclude a conviction on the conspiracy account. *Boyd,* 610 F.2d at 528. Therefore, there is sufficient evidence to convict both defendants King and Payne for conspiracy and sufficient evidence to convict King on the substantive count of money laundering.

## VII.

■ Defendant King argues that he should not have been given an enhancement under United States Sentencing Guideline § 2S1.1 because he believed the funds were the proceeds of an unlawful activity. Defendant King argues that he was convicted in a "sting" operation and the money was not actually drug money. Therefore, he contends that the money is not the "proceeds of an unlawful activity" as defined in the Guideline.

The plain meaning of Guideline § 2S1.1 states that the enhancement applies if the defendant "knew or believed that the funds were the proceeds of an unlawful activity." The Guideline indicates that as long as the defendant believes that the funds were the proceeds of an unlawful activity, the Guideline applies. The district court is affirmed on this issue.

## VIII.

Finally, we must decide whether defendant Payne should receive the benefits of an acceptance of responsibility pursuant to Guideline § 3E1.1 and minimal participation in the criminal enterprise pursuant to Guideline § 3B1.2(a).

■ Defendant Payne argues that he was not given the benefit of the accept-

---

**3.** Defendant King argues that the specific currency that he received from the undercover agent on April 12, 1989 cannot be traced and its location remains unknown. This does not mean, however, that there is insufficient evidence to indicate that after giving King $25,000 in cash, the undercover agent received back a laundered check for $25,000 made payable to his account in a fictitious name at Putnam In-

vestment. Defendant King's argument that defendant Coyle, who had never been given any money by the undercover agent, was alone responsible for the laundered money is ridiculous. If defendant King just "sat on" the $25,000 as he alleges, why didn't he return the money to Monaghan. King's argument that the government's version of events is contrary to the evidence is without merit.

ance of responsibility guideline because he decided to testify in his behalf at trial and stated that he withdrew from the conspiracy. We review a district court's determination of acceptance of responsibility under a clearly erroneous standard. *United States v. Williams*, 940 F.2d 176, 182 (6th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 666, 116 L.Ed.2d 757 (1991). The district court made a finding that defendant Payne had not withdrawn from the conspiracy as he testified. Because it found that Payne had testified untruthfully, the court was warranted in refusing to give him the acceptance of responsibility benefit of Guideline § 3E1.1. It cannot be said that this finding was clearly erroneous. Therefore, the district court is affirmed on this issue.

■ For the same reason, the district court is affirmed on its finding that defendant Payne did not have a minimal role in the offense. Even though defendant Payne was acquitted of the money laundering charge in the indictment, he was convicted for conspiracy to launder money. Therefore, the district court could properly find that he did not have a minimal role in the conspiracy even though he was not convicted for laundering money. This finding was not clearly erroneous, because defendant Payne was recorded talking to undercover agent Monaghan, telling Monaghan that he could set up a transaction which would launder his money for a 20% fee very quickly and that he would set up a fictitious business to do so, and this role was not a minimal role in this offense. For these reasons, the district court is affirmed on these issues.

### IX.

To conclude, the district court is hereby AFFIRMED.