**UNITED STATES of America, Plaintiff,**

v.

**David M. FOSTER, Defendant.**

No. 93–CR–80141–DT.

United States District Court,
E.D. Michigan, S.D.

Oct. 18, 1993.

---

361

Richard L. Delonis, Detroit, MI, for plaintiff.

David F. DuMouchel, Detroit, MI, for defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS INDICTMENT BECAUSE OF OUTRAGEOUS GOVERNMENT CONDUCT

ROSEN, District Judge.

## I. INTRODUCTION

On February 10, 1993, a grand jury convened in this District returned an eight count indictment charging Defendant David M. Foster, a Michigan lawyer, with four counts of money laundering in violation of 18 U.S.C. §§ 1956(a)(2)(A) & (a)(2)(B),[1] two counts of causing a financial institution to fail to file a Currency Transaction Report (CTR) in violation of 31 U.S.C. § 5324(a)(1), one count of causing a financial institution to file a false CTR in violation of 31 U.S.C. § 5324(a)(2), and one count of structuring a financial transaction in order to evade reporting requirements in violation of 31 U.S.C. § 5324(a)(3).[2] The Government alleges that from November of 1987 through May of 1988 Defendant laundered $118,000 in currency through his client trust account.

Defendant has moved this Court under Fed.R.Crim.P. 12 to dismiss the indictment because the Government's investigative conduct was so outrageous as to deprive him of his Fifth Amendment right to due process.[3] After considering the parties' briefs, the oral arguments made by counsel on August 25, 1993, and transcripts of tape recordings made by undercover agents acting on behalf of the Government, the Court is now prepared to rule on this motion. This Memorandum Opinion and Order sets forth that ruling.

## II. FACTUAL BACKGROUND

This case arises from an extensive undercover investigation of money laundering activities conducted by the Criminal Investigation Division of the Internal Revenue Ser-

---

1. 18 U.S.C. §§ 1956(a)(2)(A) and (a)(2)(B) read as follows (emphasis added):

   **Laundering monetary instruments ...**

   (a)(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States ...—

   (A) with the intent to promote the carrying on of specified unlawful activity; or

   (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation is designed in whole or in part—

   (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

   (ii) to avoid a transaction reporting requirement under State or Federal law,

   shall be sentenced to a fine of $500,000 or twice the value of the monetary instrument or funds involved in the transportation, transmission or transfer, whichever is greater, or imprisonment for not more than twenty years, or both. For the purpose of the offense described in subparagraph (B), *the defendant's knowledge may be established by proof that a law enforcement officer represented the matter specified in subparagraph (B) as true, and the defendant's subsequent statements or actions indicate that the defendant believed such representations to be true.*

2. 31 U.S.C. §§ 5324(a)(1)–(3) read as follows:

   **Structuring transactions to evade reporting requirement prohibited**

   **(a) Domestic coin and currency transactions.**—No person shall for the purpose of evading the reporting requirements of section 5313(a) [Reports on domestic coin and currency transactions] ...

   (1) cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a) ...;

   (2) cause or attempt to cause a domestic financial institution to file a report required under section 5313(a) ... that contains a material omission or misstatement of fact; or

   (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

   31 C.F.R. § 103.22(a)(1) states: "Each financial institution ... shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000."

   The penalty for a violation of 31 U.S.C. § 5324(a) in an amount of over $100,000 in a twelve-month period is a fine of not more than $500,000, imprisonment for not more than 10 years, or both. 31 U.S.C. § 5322(b).

3. Defendant also states that the Government's conduct violated his Fourteenth Amendment due process rights. However, because on these pleadings only federal law enforcement agencies were involved in this case, the Fourteenth Amendment does not apply.

vice. Defendant Foster was not an original target of the investigation.

Undercover agents learned of Defendant through a series of referrals. On August 5, 1987, investigation targets Dominic Vivio and Anthony Tombrillo introduced the undercover agents to another investigation target: Sam Donato, a sports bookmaker.[4] Tape # 30, p. 8. In a meeting on September 24, 1987, between Vivio, Tombrillo, Donato, and the undercover agents, Donato stated that he knew an attorney with a client trust account who was willing to launder up to $1 million for the agents. Donato stated that the lawyer assured him that the account was protected by attorney-client privilege and thus no one could ask about it. Tape # 47, pp. 19–21, 27.

In an October 15, 1987 meeting attended by Donato, Vivio, Tombrillo and the agents, Donato told the agents more about the attorney he knew who was interested in money laundering. Donato said that he had met the lawyer through a "money contact," later identified by the agents as Marvin Weisman. Tape # 52, p. 21. Donato stated that the lawyer had in the past placed bets with him. Tape # 52, p. 30. Donato further represented that the lawyer had suggested using his client trust account to transmit money to a dummy corporation in the Cayman Islands. Tape # 52, pp. 21–22. Donato noted that the lawyer was very cautious in their conversations and had written everything down because he thought Donato may be wired. Tape # 52, p. 25.

Donato telephoned the lawyer, whom he called "David," to arrange a meeting for the afternoon of October 15 between the lawyer and the agents.[5] The agents proceeded to Defendant's office, and told him that they were professional money launderers who had large sums of untaxed cash. Tape # 53, pp. 38, 95. Defendant indicated that he was aware that the agents were talking about money "that hasn't been taxed." *Id.* at 38. Defendant further stated that he had reviewed the banking regulations prior to the meeting. *Id.* at 38–39, 99. The agents also told Defendant that Donato had relayed to them Defendant's suggestion of laundering money through his client trust account to a dummy corporation in the Cayman Islands; Defendant agreed that that was his plan. *Id.* at pp. 20–25, 35. Defendant pointed out that the IRS could not reach the Cayman Islands corporation because the U.S. did not have any tax treaties with the Cayman Islands. *Id.* at p. 101. He also told the agents that

---

4. Vivio, Tombrillo and Donato also face money laundering charges as a result of the Government's investigation. *See United States v. Vivio*, No. 92–CR–80587 and *United States v. Vivio et al.*, No. 93–CR–80814.

5. Tape # 53, pp. 36–37. Defendant asserted at the oral argument on this motion that he had never met Sam Donato. The tape transcripts, however, support the Government's assertion that Donato and Defendant had had prior contact. For example, when Donato called Defendant on October 15, he began the conversation: "Hello, David? This is Sam ..." Tape # 52, p. 36. Defendant and Mr. Donato, then, were on a first name basis before any meeting between the undercover agents and Defendant. Furthermore, it is clear from the context of the conversation that Donato and Foster had discussed, at least generally, the "business" of the two undercover agents prior to this phone conversation.

Similarly, in the October 15, 1993 meeting between the agents and Defendant, Defendant spoke of Donato in familiar terms:
FOSTER: It's my understanding from Sam, it was very general, brief discussion, that you guys are coming out to Detroit from New York?
AGENT 2: Yeah.
FOSTER: Cause the first question I asked him, was, look, you guys are, I can see from (unintelligible) ... you know as a lawyer. And he, he explained that you wanted a base....
Tape # 53, pp. 20–21. Other excerpts from the tapes show that Defendant did indeed know Donato before the agents first met with Defendant. In Tape # 53, pp. 52–53, the undercover agents tell Defendant how they came to be introduced to him "through Sam," and Defendant responded "Right." In that same conversation Defendant went on to indicate that even though he may have met Donato, he was not certain he remembered it, but that Donato knew him in any event through a "very, very good client and close friend." *See also* Tape # 60, pp. 108–09 (Defendant explained to agents how he met Donato through Marvin Weisman); Tape # 52, p. 30 (Donato saying that his lawyer friend had placed bets with him before). Given this significant evidence that Donato and Defendant were acquainted, the Court simply cannot accept Defendant's argument that he and Donato did not know each other.

they would not have to answer questions about the client trust account from law enforcement officers or perhaps even a grand jury because of attorney-client privilege. *Id.* at pp. 71–72. The undercover agents specifically told Defendant that their money came from illegal gambling. Tape # 53, p. 95. When the agents suggested that Defendant might want to think over the deal because of where their money originated, Defendant said that was not a problem for him. *Id.* at 106. Indeed, at three different points in the October 15, 1987 meeting Defendant told the agents he had "thought about" money laundering over "the last couple of weeks." *Id.* Before the meeting ended, Defendant went so far as to tentatively negotiate a 6½% fee for laundering the money. *Id.* at p. 64. Finally, Defendant advised the agents that he was worried about eavesdropping and bugs. Tape # 53, pp. 30–31; *see also* Tape # 63, p. 70.

On October 20, 1987, Defendant suggested to one of the agents during a telephone call that they set up a corporation and accompanying bank account in Liechtenstein to avoid IRS review. Defendant stated that Liechtenstein had no tax treaty with the U.S. whereas the Cayman Islands, the Dutch Antilles, and Switzerland did. Tape # 54, pp. 4–5. In an October 29, 1987 meeting between the agents and Defendant the agents again informed Defendant that all of their money was derived from illegal activities, including drug trafficking. Tape # 55, pp. 79–84. Defendant indicated that he assumed the money was from gambling, *Id.* at 82, and that there would not be bad feelings about the money coming from drugs. *Id.* at 83–84.

The scheme that Defendant and the undercover agents finally agreed upon worked as follows. Defendant would set up a corporation in Liechtenstein with an accompanying bank account. Defendant would then deposit money provided by the agents first into his

client trust account and then on to the Liechtenstein bank account via wire transfer or cashier checks. Once in the overseas account the agents would have sole control over the money. *See* Tape # 69, pp. 30–32; *see also* Tape # 55, pp. 11–18.

The Indictment in this cases charges Defendant for the following acts: (1) On November 18, 1987, he deposited $27,000 in currency into his client trust account and filled out a CTR with a material omission and misstatement of fact (Count 1). (2) On December 28 of that year he wired $27,000 to Liechtenstein with the belief that it was derived from illegal sources (Count 2). (3) On March 2 and 3, 1988, Defendant allegedly made seven separate deposits totalling $50,-000 into his client trust account; he failed to file CTRs for these transactions because he broke the money down into installments of less than $10,000 (Count 3 & 4).[6] (4) On March 7, 1988, he allegedly transferred $53,-000 to Liechtenstein believing that money to be derived from illegal sources (Count 5 & 6). (5) On May 6 and May 9, 1988, he allegedly made five separate deposits into his client trust account totalling $38,000; he structured each of these deposits to be less than $10,000 so as to avoid filling out CTRs (Count 7). (6) On May 12 he allegedly transferred that $38,000 to Liechtenstein believing it to be derived from illegal sources (Count 8).

### III. *ANALYSIS*

▆ In *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), the U.S. Supreme Court acknowledged that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the Government from invoking judicial processes to obtain a conviction"—even when the defendant was not entrapped.[7] Never-

---

6. *See, supra,* n. 2 for the significance of the $10,000 figure.

7. The Court will set forth the distinction, as it understands it, between the defenses of entrapment and outrageous government conduct. The former is a defense of fact: did the defendant have the predisposition to commit a crime? *See Russell,* 411 U.S. at 427–28, 93 S.Ct. at 1641. If

he did, then generally the government's participation in the crime is no bar to his conviction.

Outrageous government conduct is the exception to rule that if a defendant is predisposed to crime nothing the government does can keep it from prosecuting the defendant. Outrageous government conduct is a purely legal defense, and it applies only if the government violated

theless, in *Russell* the Court rejected an outrageous conduct defense when it reversed a court of appeals ruling overturning a conviction. The Court believed that the provision of a chemical by a government agent to a defendant convicted of drug manufacturing fell "far short of violating that 'fundamental fairness shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." 411 U.S. at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States*, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960).

*Russell* and its progeny have left the development of the outrageous conduct defense to the lower courts. *See United States v. Luttrell*, 889 F.2d 806, 811 (9th Cir.1989) ("The Supreme Court opinions give little guidance by which we may determine whether the government's conduct was outrageous."), *modified*, 923 F.2d 764 (9th Cir. 1991). Fortunately, the Sixth Circuit has had numerous opportunities to refine standards to guide the lower courts of the Circuit on the parameters of this defense.

██ The Sixth Circuit has established four factors to be weighed in determining whether police conduct was so "outrageous" as to violate the Due Process Clause: "(1) the need for the type of government conduct in relationship to the criminal activity; (2) the preexistence of criminal activity; (3) the level of the direction or control of the criminal enterprise by the government; (4) the impact of the government activity to create the commission of the criminal activity." *United States v. Moore*, 916 F.2d 1131, 1139 (6th Cir.1990) (quoting *United States v. Johnson*, 855 F.2d 299, 305 (6th Cir.1988)). These factors are for guidance only, and, therefore, the presence of each factor need not be shown. *United States v. Barger*, 931 F.2d 359, 363 (6th Cir.1991).

Defendant makes five arguments to dismiss the indictment:

(1) there was no need for a clandestine, undercover infiltration ... because money laundering and alleged improper reporting schemes are readily discoverable through bank and other corporate records, (2) a criminal enterprise involving Mr. Foster and money laundering or improper transactional reporting did not preexist the Government's undercover sting operation, (3) the Government through its undercover IRS agents, directed and controlled the criminal enterprise, [ ] (4) the Government activity alone was the impetus to create the commission of the criminal activity alleged.... [And (5)] [] the Government undercover sting operation was not founded upon *any* reasonable suspicion that Mr. Foster was involved in criminal activity, further establishing that it was the Government's enticement that was the sole contributing factor to Mr. Foster's alleged criminal conduct.

Defendant's Brief, pp. 3–4 (emphasis in the original). The Court will address each of these arguments in turn.

### A. THE NEED FOR UNDERCOVER OPERATIONS.

██ Defendant argues that there was no need for the Government to conduct undercover operations in this case. Defendant posits that the Government could have easily monitored his financial transactions in order to discover any wrongdoing.

The Sixth Circuit rejected a similar argument in *United States v. Payne*, 962 F.2d 1228, 1231 (6th Cir.1992), *cert. denied*, ——

---

defendant's constitutional rights to such an extent that a court should not allow the government to prosecute him, regardless of his predisposition to commit a crime. *See Hampton v. United States*, 425 U.S. 484, 495–96 & n. 7, 96 S.Ct. 1646, 1652–53 & n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring) (holding that government agent's provision of narcotic that defendant was prosecuted for possessing was neither entrapment nor outrageous conduct). A plurality of the *Hampton* Court stated that the defense of outrageous government conduct should not exist independent of the entrapment defense; if the government could prove that the defendant was predisposed to commit a crime, its own conduct should not bar a prosecution. 425 U.S. at 489–90, 96 S.Ct. at 1650. A majority of the justices, however, were unwilling to go this far. 425 U.S. at 496–97 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring); *see also* 425 U.S. at 499–500, 96 S.Ct. at 1655 (Brennan, J., dissenting). The concurring opinion by Justice Powell nonetheless conceded that proof of a defendant's predilection to crime will often dispose of an outrageous conduct defense. 425 U.S. at 496–97 n. 7, 96 S.Ct. at 1653 n. 7.

U.S. ——, 113 S.Ct. 306, 121 L.Ed.2d 229 (1992) (defendant King). The *Payne* court also confronted a money laundering case; because of its striking similarity to the instant case, the Court will fully treat with the operative, pertinent facts of *Payne*.

In the spring of 1988, the IRS received a tip that Frank Coyle, a Cleveland stockbroker, was engaged in money laundering. An undercover IRS agent contacted Coyle on July 12, 1988; Coyle identified defendant Val C. King as a friend who could launder any amount of money for a 25% fee. The agent objected to the high fee, and Coyle called King on the telephone to negotiate the price down. Eventually, King agreed to launder the agent's money for a 15% fee. King devised a scheme whereby two attorneys would launder the agent's money. This plan, which the attorneys attempted to put into effect from September, 1988 to March, 1989, worked poorly. Coyle asked King to find another laundering mechanism. When King finally met the undercover agent on March 23, 1989, King told the agent that he had made arrangements with defendant Hubert Payne to launder the money. 962 F.2d at 1229–30.

On March 31, 1989, the agent met Payne, King and Coyle. At that meeting, Payne suggested that they launder the money through a dummy corporation he controlled. On April 12, 1989, King picked up $25,000 in cash from the agent and proceeded to Payne's house. Payne then purchased bank checks, all less than $10,000, with the cash. Next he deposited those checks into the bank account of his dummy corporation, Investors Unlimited. Payne then wrote a check of $25,000 payable to a bank account set up by defendants for the agent and drawn on the dummy corporation account. 962 F.2d at 1230. The government indicted Coyle, King, Payne, the two attorneys, and another defendant who had helped Payne set up the dummy corporation account on the charges of money laundering and conspiracy to launder money. 962 F.2d at 1230–31.

Among defendant King's arguments that the government's sting operation constituted outrageous conduct, he first asserted that the government did not have to investigate money laundering with an undercover agent when it could have monitored *all* financial currency transactions. The Sixth Circuit dismissed this argument summarily by saying that the government does not have such authority. 962 F.2d at 1231.

In the instant case Defendant also argues that the Government could have relied upon a review of bank records rather than undercover operations to reveal the alleged money laundering. Defendant attempts to distinguish this case from *Payne* because the Government did have the authority to look at *particular* bank records under 12 U.S.C. §§ 3402 (Access to financial records by government authorities prohibited; exceptions), 3405 (Administrative subpoenas and summons), 3406 (Search warrants), 3407 (Judicial subpoena), and 3408 (Formal written request). Thus, Defendant states that the availability of a less intrusive method of investigation supports the motion to dismiss the indictment.

■■ The Court rejects this contention out of hand. Money laundering is a crime of subterfuge and concealment. Bank records alone reveal little, if any, information if the alleged laundering is as sophisticated as is alleged in this case. Undercover investigations therefore can be an essential tool in tying seemingly innocuous bank entries to criminal activity. Without the undercover investigation in this case, for example, the Government would not have learned from Donato of Defendant's willingness to engage in money laundering. Thus, this Court agrees with *Payne* that a review of bank records is not an automatically adequate substitute for undercover investigations of money laundering. The Court further adds that while courts should review the *effect* of different means of investigation, they should rarely, if ever, second-guess law enforcement agencies on the initial *selection* of those means. As then-Justice Rehnquist said with respect to entrapment, the Court does not believe the defense of outrageous government conduct was "intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it d[oes] not approve." *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644.

## B. *THE PREEXISTENCE OF CRIMINAL ACTIVITY.*

■ Defendant contends that there is absolutely no evidence that he was engaged in any preexisting criminal activity when the undercover agents approached him to launder money. Defendant specifically cites a statement he made to the agents that he had never done anything like this before. Tape # 55, p. 15. Defendant further stresses that the Government approached him after meeting with Sam Donato, someone Defendant claims he had just met. Tape # 60, pp. 108–09. Because of this lack of evidence of any preexisting illegal action on the part of Defendant, he urges the Court to dismiss the indictment.

The Court believes that the preexisting criminal activity element in the outrageous conduct defense does not aid Defendant's motion to dismiss the indictment. At the time of the undercover agents' first contact with Defendant, two men who were part of the chain leading to Defendant, Vivio and Tombrillo, had allegedly already made attempts at money laundering. More importantly, the Government knew from Donato that Defendant was interested in laundering the agents' money, and that Defendant had even progressed so far as to devise a plan to accomplish it. The Court holds that, by virtue of Donato's representations to the agents as to Defendant's willingness to launder money, even before the agents made contact with him, the agents reasonably believed that Defendant had either engaged in prior criminal activity or was inclined to be a willing participant. Thus, the agents' conduct was not "outrageous" when they initially focused their attention upon Defendant. Furthermore, once Defendant and the agents had met, it is clear from the tape transcripts that Defendant was a willing and enthusiastic participant in the scheme, and his continuing involvement and aggressive efforts manifestly warranted the agents' continued attention.

The Court reaches this conclusion by relying again upon *Payne*. In that case, defendant King made the same argument Defendant makes in the instant case:

> The second factor to consider is whether the criminal enterprise preexisted the undercover investigation. Defendant King argues that the government only had suspicions of defendant Coyle, the stockbroker, who had been implicated by the FBI informant. Defendant King argues that before the undercover sting operation, the government had no suspicions that he was involved in money laundering.

962 F.2d at 1231. The court flatly rejected this contention:

> This argument is to no avail. Before the undercover officer ever met defendant King and discussed money laundering with him, the government had "reasonable suspicion" that he was involved in money laundering because the undercover agent had witnessed a telephone call in which Coyle called defendant King and defendant King agreed to launder money for a certain fee. *Just because King was unknown when the undercover operations commenced does not mean that his constitutional due process rights were violated or that the government's conduct was outrageous.* Once an undercover operation has begun, new conspirators, who are at first unknown to the government, may be uncovered during the course of the investigation.

962 F.2d at 1231–32 (footnote omitted) (emphasis added).

The facts in the instant case are similar to *Payne*. Just as government agents knew from a reliable source that defendant King was willing to launder money in *Payne*, the agents in this case learned from a reliable source, Donato, that Defendant wanted to launder money for a commission. The *Payne* court did not require the government to provide proof of any wrongdoing by King prior to the government investigation. This Court also does not see the need for such a showing of Defendant's prior criminality here. Given Defendant's representations to Donato regarding his interest in and plans for money laundering, at the time the agents met Defendant they had a reasonable suspicion that he was either part of, or would become part of, the money laundering network their investigation was hoping to infiltrate and crack. Meeting with Defendant to

see if his interest was genuine was, therefore, hardly outrageous.

Defendant's statement on October 29, 1987, that he had never done this before does not change the Court's conclusion. Defendant did not make that statement until *after* the undercover agents first met with him and discussed money laundering on October 15. By the time of the October 29 statement, Defendant had already taken significant steps towards arranging the laundering of the agents' money. Therefore, at the time Defendant made his statement the Government was certainly warranted in pursuing its investigation regardless of his level of experience in money laundering.

## C. THE DIRECTION AND CONTROL OF THE ENTERPRISE.

█ The parties vigorously dispute the extent of the Government's direction of the alleged money laundering in this case. Defendant argues first that Tape # 69, a recording of a meeting between the agents and Defendant on November 18, 1987, shows that he was, with the active encouragement of the agents, learning as he went along in setting up the Liechtenstein corporation. As further proof that it was the agents and not Defendant who were running the operation, Defendant cites a part of that same meeting in which one of the agents told Defendant his original idea to make cash deposits to the client trust account in excess of $10,000, and therefore have to fill out a special IRS form on deposits of that size or greater, was "crazy." Tape # 69, p. 70.

The Court's review of Tape # 69 reveals, however, that it was Defendant who carefully explained each step of the scheme with the agents after working out the details himself. Tape # 69 pp. 30–32. *See also* Tape # 55, pp. 11–18. A later tape also demonstrates that Defendant agreed wholeheartedly with deposits to his client trust account of under $10,000 so as to avoid signing the special IRS deposit form mentioned above. Tape # 75, pp. 23–27. Thus, contrary to Defendant's

contentions, the tapes portray Defendant as the primary conceptualizing force in the money laundering scheme.

Defendant also points out that the agents not only provided the money for laundering but also directed his deposits to his client trust account and his transfers to Liechtenstein. Furthermore, once in Liechtenstein, the money was under the exclusive control of the agents. Thus, according to Defendant this case is not like *Payne*, 962 F.2d at 1232; in that case, the government merely provided the funds to be laundered through mechanisms set up by the defendants. Because the Government was allegedly more involved in this case, Defendant asks the Court to dismiss the indictment.

Again, the tapes demonstrate that Defendant was not only a willing dance partner in the money laundering scheme; he was the key planner and actor. Defendant was the one who first suggested to Donato that they launder up to $1 million through his client trust account protected by attorney-client privilege. Tape # 47, pp. 19–21, 27. Later, in his meetings with the agents, Defendant selected Liechtenstein as the best destination for the money because it had no tax treaty with the U.S. Tape # 55, p. 11. Defendant also chose the name of the dummy corporation, Tape # 78, p. 3, and he changed the client trust account to a non-interest bearing account to avoid IRS review. Tape # 103, pp. 70–71. Finally, he suggested using different branches of the bank holding his client trust account to evade Currency Transaction Report requirements. Tape # 117, pp. 4–5, 12; Tape # 119, pp. 18–23.[8]

This case is therefore much more like *Payne* than Defendant suggests. In that opinion, the court wrote:

> The roleplaying and provision of money in the present case merely gave the defendants the opportunity to commit the crime of money laundering. The defendants, on the other hand supplied the fictitious account in which to deposit the laundered money and accepted the cash and convert-

---

8. To the extent the undercover agents directed Defendant when to make the transfers and controlled the funds once they got to Liechtenstein, the Court accepts the Government's argument that such steps were necessary to protect federal property. They hardly constitute the kind of government control of illegal activity necessary for a finding of outrageous government conduct.

ed it into checks without the filing of a currency transaction report, set up a fictitious business called Investors Unlimited, and then issued checks back to the fictitious account previously set up to accept the laundered cash.... *[I]n the present case we do not believe it was excessive merely to provide the money to be laundered. It was the defendants who devised the manner in which the cash was to be structured to avoid detection.*

962 F.2d at 1232 (emphasis added).

Similarly, in this case if Defendant took as much initiative as the tapes suggest, then there are no grounds for quashing an indictment because of over-direction and control on the Government's part. The Government here, as in *Payne,* essentially provided the funds for the Defendant to make his money laundering plan a reality.

## D. THE IMPACT OF THE GOVERNMENT'S ACTIVITY.

Defendant argues that without the allegedly extensive Government activity in this case Defendant would have committed no crime. The facts as alleged and supported by the transcripts, however, simply do not bear this out.

The Government learned of Defendant's interest in laundering money through a reliable independent source, Sam Donato, who at the time was not an agent of the Government, but rather an investigation target himself. When the agents first approached Defendant, he not only readily agreed to launder money through his client trust account just as he had discussed with Donato, but the tapes reveal he was eager to do it. Defendant's willingness to engage in money laundering, then, minimizes the impact of the undercover agents' participation in the transactions.

The low level of impact the Government's actions had in this case is analogous to other situations courts in this circuit have encountered. In *United States v. Norton,* 700 F.2d 1072, 1075–76 (6th Cir.1983), *cert. denied,* 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983), the Sixth Circuit held that an agent's conversion of dynamite to a fake bomb for defendants to use against a synagogue was inadequate direction and control to acquit defendant because of outrageous government conduct. The court reasoned that if the government could prosecute possessors of drugs the government provided, it should also be able to prosecute conspirators even though the government provided the weapons. 700 F.2d at 1076. Similarly, in *United States v. Porter,* 709 F.Supp. 770, 781 (E.D.Mich. 1989), *aff'd without op.,* 895 F.2d 1415 (6th Cir.1990) (full opinion available at 1990 WL 14635, 1990 U.S.App. LEXIS 2400 (6th Cir. Feb. 20, 1990), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 583, 112 L.Ed.2d 588 (1990), the court held that a single solicitation by the government to a preexisting list of pornography consumers had an insufficient impact on the criminal activity under indictment to grant an acquittal on the grounds of outrageous government conduct.

In the instant case, the agents merely contacted Defendant after learning from Donato that Defendant had a scheme to launder their money. According to the tapes, Defendant then proceeded to implement his plan with care and vigor. Because of Defendant's clear willingness, even eagerness, to engage in money laundering, the Government's participation in the plan was clearly not the sole "impetus to create the commission of illegal activity." Defendant's Brief, p. 3.

## E. THE GOVERNMENT'S REASONABLE SUSPICION TO TARGET DEFENDANT IN AN UNDERCOVER STING.

Defendant argues finally that the Government lacked any reasonable suspicion to target Defendant for a money laundering sting operation. However, as discussed above, the Government clearly did have reasonable suspicion. Its agents learned from Sam Donato of Defendant's willingness to launder money. From this tip it proceeded to contact Defendant, who agreed to channel money he believed to be illegally acquired through a mechanism that he had suggested earlier to Donato. There can be little doubt, then, that a reasonable suspicion that Defendant would indeed engage in unlawful money laundering activity existed in this case.

## IV. *CONCLUSION*

For the foregoing reasons, this Court holds that the Government's investigation of Defendant was not so outrageous as to deny him his right to due process. Accordingly,

IT IS HEREBY ORDERED that the Defendant's Motion to Dismiss the Indictment is DENIED.